PRINCE GEORGE'S COUNTY, MARYLAND ET AL. *v.*
HERSCHEL BLUMBERG ET AL.

[No. 152, September Term, 1979.]

*Decided November 7, 1979.*

80

The cause was argued before GILBERT, C. J., and MORTON and WILNER, JJ.

*Alan E. D'Appolito, Associate County Attorney for Prince George's County,* with whom were *Robert B. Ostrom, County Attorney,* and *Michael O. Connaughton, Deputy County Attorney,* on the brief, for appellant Prince George's County, Maryland. *Paul T. Sisson* for appellant Washington Suburban Sanitary Commission.

*Joseph P. Blocher* and *Barbara A. Sears,* with whom were *Linowes & Blocher* on the brief, for appellees.

*Note: *Certiorari* granted, Court of Appeals of Maryland, January 25, 1980.

WILNER, J., delivered the opinion of the Court.

This is a case of government running amok. The facts are long and complicated (the printed record extract is nearly 1,500 pages); but what happened, in a nutshell, is that Prince George's County and the Washington Suburban Sanitary Commission (WSSC), after careful study and review, each issued appropriate permits allowing Herschel and Marvin Blumberg to construct a twenty-million dollar high-rise apartment complex, and, after the Blumbergs had commenced construction pursuant to and in reliance on those permits, those agencies revoked the permits and have refused to reissue them.

In an action by the Blumbergs against the county, WSSC, and two former County Executives, the Circuit Court for Prince George's County (1) directed the county and WSSC to reissue the permits, (2) awarded a judgment for substantial damages against the county, (3) dismissed the action for damages against WSSC on the ground of its sovereign immunity, and (4) sustained demurrers filed by the two former County Executives (Gullett and Kelley), dismissing them from the case. No one, except Gullett and Kelley, was entirely satisfied with this result. The county has appealed both the directive to reissue the building permit and the judgment for damages; WSSC has appealed the order requiring the reissuance of its water and sewer permits; and the Blumbergs have cross-appealed the court's refusal to grant monetary relief against WSSC and the dismissal of their action against Gullett and Kelley. We shall here affirm all actions of the circuit court save two; we believe that the court erred (1) in its calculation of damages against the county and (2) in determining that WSSC is entitled to sovereign immunity. We shall therefore remand those aspects of the case for further proceedings in accordance with this Opinion.

The land in question consists of about 40 acres located on Belcrest Road in the Hyattsville area of Prince George's County. The Blumbergs had planned to develop the property since at least 1961, but because of one thing or another —

interest rates, tight money — the project did not begin to move forward in earnest until 1971. On July 16, 1971, through counsel, they wrote to WSSC, recounting some of the history of the project, advising of their intention to start construction of a 600-unit high-rise apartment building, and requesting a determination that "the present situation will permit sewer service" for the project. As was pointed out in the letter, the project would not have required any new or extended sewer lines. There was a line already running across the property, and what the Blumbergs needed was permission to connect into it.

This request was referred to the Commission's Legal Department. On October 6, 1971, Paul J. Hefferon, Staff Counsel to WSSC, responded that, in the Commission's opinion, because the connection would be into an existing line, "a connection of the proposed apartment building would be permitted under the existing letter order of the State Department of Health dated May 20, 1970." [1] Upon receipt of this letter, Marvin Blumberg went to see Mr. Hefferon. He "asked him exactly what it [the letter] meant, whether I would get sewer and water, does it mean what I think it says it means, and he said, yes, it means you are going to get sewer and water."

With this assurance, the Blumbergs engaged an architect and began preparing final plans for their building. On April 6, 1972, they formally applied to WSSC for sewer and water service, paying, at that time, the fees set by WSSC of $8,925.

At about this time, WSSC became concerned whether, in light of delays in the expansion of the Blue Plains Treatment Plant, the State-imposed moratorium was sufficient to protect water quality in the metropolitan Washington area. On June 21, 1972, the Commission, by Resolution No. 72-053, decided to impose certain additional restrictions of its own on sewer hookups in a number of the basins in the area, including the Anacostia basin in which the Blumberg project was located. One effect of this Resolution was to subject the Blumberg

---

1. The reference here is to the "sewer moratorium" established by the State Secretary of Health and Mental Hygiene. The undisputed import of this letter is that because the connection was to an *existing* line and did not require any *new* lines, it was not barred by the Secretary's directive.

application to approval by the Commission itself, rather than by the staff. Perhaps in furtherance of this action, on July 27, 1972, John F. Stabely, the head of the WSSC Permits and Records Section, advised the Blumbergs that Mr. Hefferon's letter of October 6, 1971, "should not be construed as a commitment by the Commission to provide service. Because of limitation in system capacity no commitment for service can be made."

Faced with this apparent retrenchment on the part of the Commission, the Blumbergs pressed their case for hook-up approval. On August 24, they wrote to James A. Stapp, WSSC Director of Engineering and Construction, complaining about the implications of the July letter and pointing out their reliance on previous assurances given by various Commission personnel. They also enlisted the aid of then-County Executive William W. Gullett (a cross-appellee here) and then-County Councilwoman Gladys N. Spellman, both of whom wrote to the Commission endorsing the project.

On August 23, 1972, the Commission adopted Resolution No. 73-066, the second in a series of four dealing with sewer connections. This Resolution, made effective as of August 2, 1972, suspended all applications for sewer connections of the type represented by the Blumberg project (more than 10 dwelling units). There were several exceptions to this suspension, of which two are, or will soon become, relevant here. The first of these was contained in ¶ 2(b) of the Resolution: "situations where, on a premise of availability of water and sewer service, a . . . building permit . . . has been issued on or before August 2, 1972 by the [county] or where a WSSC connection application . . . has been approved or issued by the WSSC on or before August 2, 1972." The second relevant exception was set forth in ¶ 3(c). This allowed the Commission to suspend or waive the provisions of the Resolution for good cause shown, provided that it first determine the existence of good cause before considering the merits of the application.

Notwithstanding this Resolution, the Blumberg application was placed on the Commission's agenda for its October 4 and October 11 meetings as Item No. 465. In connection therewith,

Mr. Stapp, the Director of Engineering, submitted to each Commissioner a packet of material concerning the project, with a covering memorandum dated September 21, 1972. Among other things, this memorandum points out that the plumbing applications "are pending" and that "Mr. Blumberg wants assurance that his permits *will be processed to completion.*" (Emphasis supplied.) Testimony from Mr. Stapp and then-Commission Chairman David Elliott established that packets of this type were normally sent to the Commissioners a week or so in advance of the meeting and were brought by them to the meeting.

The Blumberg application was not acted upon at either the October 4 or October 11 meeting, but was deferred until October 25, in order to allow the staff to consider the effect of other pending applications as well on the overall capacity of the water and sewer system. The Commission did, however, at its October 4 meeting, adopt a third Resolution (No. 73-075), amending and making more restrictive the ¶ 2(b) exception contained in the August Resolution. Under the new Resolution, this exemption would be applicable only where (1) a building permit was issued prior to August 2 premised on a statement of water and sewer service availability supplied by WSSC prior to that date, or (2) approval of a connection application by WSSC on or before August 2. By WSSC approval, the Resolution meant "the acceptance and notation on the pertinent application of payment of the requisite fees", this definition intending to differentiate "between the mere tendering of an application and the WSSC staff action of acceptance and approval thereof, since the fees paid notation is not placed on the application until after such approving review occurs. . . ."

While waiting for WSSC to act upon its connection application, the Blumbergs, on October 6, 1972, applied to Prince George's County for a building permit. The application listed the Blumbergs as both owners and contractors, and described the project as phase 2 of a 36-story condominium apartment building.

October 25 was the magic day for the Blumbergs, for on that day, WSSC approved their connection application and

directed the staff to process and issue the necessary water and sewer permits. The circumstances under which that decision was made will be discussed later. Suffice it at this point to note only that the Commission's action was confirmed by letter of its Chairman dated October 27, informing the Blumbergs that their request "has been reviewed and approved for water and sewer service to 600 units apartment project. . . ." The letter continued that the authorization was subject to the installation of appropriate water saving devices, that the Commission's Plumbing Division and Permits and Records Section would be advised of the Commission's action "and authorized to process pending application and/or permits to completion", and that the "connection application and/or hookup plumbing permit" would terminate if construction did not go forward within six months of issuance of the permit. By "construction gone forward", the letter said, was meant inspection of the footings by the county.

The actual permits were issued on November 13, 1972. They reflected what the evidence otherwise showed was proposed: two towers, one 36 stories containing 288 units, one 35 stories containing 280 units, or a total of 568 units. In anticipation of receiving the permits (No. 381286 for one tower, No. 381287 for the other), the Blumbergs, on November 10, 1972, paid an additional $8,410 in WSSC fees for attaching plumbing fixtures, these fees being apart from the connection authorization fee and not necessarily being due at that time.

The next series of events concerns Prince George's County and the building permit. On October 17, 1972 — 11 days *after* the Blumbergs filed their application — the County Council adopted and sent to the County Executive Council Bill 72-1972. This bill, signed by County Executive Gullett on November 1, and taking effect January 1, 1973, provided for the licensure of building contractors. A building contractor was defined as a person who "for a fixed price, commission, fee or percentage accepts or offers to accept, orders or contracts for performing or superintending the building or construction of any building or structure . . . designed to be used as a residence or dwelling, or who constructs for sale

any new building or structure for occupancy as a residence or dwelling." Any person furnishing character references, evidence of financial responsibility, training and experience, and law-abiding nature, and a $25 fee was entitled to a license. No examination was required. However, the bill provided that, with an exception not relevant here, a building permit for a residence or dwelling "shall not be issued to any person except a duly licensed building contractor or his duly authorized agents." *See* current Prince George's County Code (1975), § 2-253.15 (then codified as § 2-72). The bill did not declare any such permit inappropriately issued to be invalid; indeed, the only sanction in the bill was a criminal penalty for doing business as a contractor without a license. *See* 1975 Code, § 2.253.18.

Because they were acting as their own builder, and thus neither constructing the building for a price or fee, or necessarily for the purpose of selling the structure, the Blumbergs apparently believed that they did not fall within the definition of "building contractor", and were therefore not required to be licensed. Accordingly, they made no application for such a license.

On January 25, 1973 — more than three weeks after this bill took effect — the County issued a building permit to the Blumbergs, notwithstanding that, as of then, they had not sought or been granted a contractor's license pursuant to the new law. The permit (No. 1597-72-CG) authorized construction of Phase I of a 35-story condominium apartment building. The Blumbergs paid a permit fee of $6,199. A month later — on February 23, 1973 — a second permit was issued (No. 1598-72-CG), upon payment of an additional $4,960, authorizing Phase II of the project — a 27-story apartment tower.[2] On March 13, 1973, upon an amended application, a third permit was issued, this one combining the earlier two permits into one and describing the project as "Phase I — 35 Story Condominium Apt. Bldg. Phase II — 27 Story Condominium Apt. Bldg." Each of the three permits was based upon an application clearly showing the contractor to

---

2. The project was to consist of two towers — one 35 stories and one 27 stories — both to be part of one building.

be the Blumbergs; and yet no question was ever raised about their not being licensed. It should be noted that the same county agency — the Department of Licenses and Permits — was responsible for issuing both building permits and contractor's licenses.

By March 28, 1973, Marvin Blumberg had been made aware of the possible need to obtain a contractor's license, for on that day he paid his $25 and made application for himself and his brother Herschel. A temporary 60-day license was duly issued to the Blumbergs on April 5, 1973, followed by an annual license on April 17, 1973.[3] In the meanwhile, on March 29, 1973, the Blumbergs broke ground and started construction. The first work done was the foundation — a concrete slab three feet thick requiring some 10,000 cubic yards of concrete. The first section footings were poured on March 30, and according to Marvin Blumberg, work proceeded apace, with more concrete being poured on almost a daily basis. The county building inspector was at the site continuously.

It was on April 12, 1973, that the raw, naked power of government descended upon the Blumbergs. The story, as the record reveals it, is this.

Notwithstanding all of the investigations, reviews, and approvals leading up to the issuance of the various permits (including zoning and site plan approval by the appropriate local agencies), notwithstanding even that County Executive Gullett himself had earlier endorsed the project in a written letter to WSSC,[4] because some citizens in the vicinity of the project thought that the building would be too high and made their feelings forcefully known to Mr. Gullett, Mr. Gullett decided that the project should not proceed as then authorized. He therefore decided to stop the construction by recalling the building permit. When called to testify, Mr.

---

3. Temporary licenses were issued because of delays in implementing the necessary administrative procedures for the issuance of the annual licenses called for by the ordinance.

4. Mr. Gullett denied that his letter constituted an endorsement. We fail to see what other purpose the letter could have, however. It was written at the behest of the Blumbergs to WSSC at a time when some question existed as to whether the water and sewer permits would be issued.

Gullett's memory about the events that ensued (and his role in causing those events to occur) was unfortunately quite vague, but it is clear beyond doubt that, bowing to community pressure, Gullett ordered that the county building permit be lifted, and that he issued that order solely because of community opposition to the height of the building, and for no other reason.[5]

Mr. Gullett apparently recognized that a building permit could not be lawfully revoked solely on the basis of political pressure, especially when construction had already commenced. Some excuse had to be found. From among those eagerly supplied by opponents of the project, Gullett picked what he thought was the fact that the Blumbergs were not licensed as contractors, as required by law, and that, under then County Code § 2-72, a building permit should not have been issued. Unaware that the Blumbergs had, in fact, obtained their license — obviously making no real attempt to find out — Mr. Gershenow, the Director of Licenses and Permits, under instructions from Gullett and bolstered by a supporting opinion of the county law department, determined that the permit was void and directed his subordinate, James Novak (Chief Building Inspector), to revoke it.[6]

Thus it was that on April 12, 1973, Mr. Novak wrote a letter to the Blumbergs advising that:

(1) "Review of the subject permit reveals that it was illegally issued because the contractor listed on the permit application *does not* possess a valid residential Building Contractor's License. . . ." (Emphasis supplied.)

(2) "The permit is, therefore, null and void. A stop work

---

**5.** Gullett confirmed his deposition testimony that he directed the head of the county department of licenses and permits, a gentleman named Gershenow, to revoke the permits, and that he did this in response to pressure from community activists. On May 7, 1973, he wrote a letter to the Mayor of University Park, in which he stated: "As you may know by now, I did rescind the building permit for the 36 story building and have informed the builder that they [sic] could not build higher than a 20 story building."

**6.** As Mr. Gullett was quick to point out, there were four or five other permits that were also revoked for the same reason. Blumbergs' is the only one of these that the county has refused to reissue, however. In their haste to revoke the permit, the county officials apparently did not consider whether the Blumbergs were even required to be licensed.

notice has been posted on the job site and work cannot commence until a valid building permit is obtained."

(3) An application for a license can be obtained from the County Service Building.

(4) "At such time as your contractor obtains the required license, the owner or his authorized agent as evidence [sic] by appropriate affidavit, may visit the Permits Office in the County Service Building to amend the permit application to list a properly licensed contractor. Previous agency approvals such as Park and Planning and WSSC will remain valid provided there is no change in law or regulations in the interim period. *Following your amendment to the permit application to satisfy the legal requirements, the permit will be validated and a new issue date inserted.* There will be no additional fee for the reissue." (Emphasis supplied.)

Having made the decision to lift the permit, the county tarried not in enforcing the Gullett edict. Novak's letter was hand delivered to Blumberg at the jobsite the day it was written. That same day — April 12 — the county building inspector slapped two violation notices on the job. The job was very effectively and very quickly shut down,[7] and it remained so despite the fact that Blumberg immediately notified the county that he and his brother were, in fact, licensed.

We return now to WSSC, which had also been made aware of some organized opposition to the project, primarily because of the proposed height of the building. The Commission heard from these groups on April 4 and April 8. Chairman Elliott stated that on April 11, 1973, he received a call from one of Gullett's aides, Jay Morris, who advised him that "a decision had been made in the County Executive's Office" to recall four or five permits that did not conform to county regulations "and that we should follow suit." Elliott interpreted this call as an instruction to take similar action, and expressed the belief that the Commission had a duty to

---

7. Mr. Novak testified that summary revocation, as opposed to simply allowing an owner or contractor a reasonable time to correct a deficiency, was used only in cases of misrepresentation. He conceded, however, that there was no misrepresentation here, and that he acted upon the instructions of Mr. Gershenow and the advice of the county law department that the permit was null and void.

follow that request if it was legal.[8] He and the Commission apparently thought the request was legal, for that same day, April 11, *without notice to the Blumbergs,* much less a hearing, the Commission adopted an Order reciting, in relevant part:

"The Commission having before it, this 11th day of April 1973, matters presented in connection with the water and sewer permits . . . issued on November 10, 1972, to [the Blumbergs] and the Commission being advised, by oral report, that *the Prince George's County Executive* is this date ordering the vacation or withdrawal of the building permit for the construction with respect to which the water and sewer permits pertain, *together with the advice that the County Executive proposes to recirculate the building permit proposal to pertinent agencies, including this Commission before the building permit might be reissued or reinstated,* and the Commission being advised in the premise, it is, this 11th day of April 1973,

"ORDERED, that the efficacy of the permits issued by the Washington Suburban Sanitary Commission on November 10, 1972, with respect to water and sewer service for the proposed Plaza Towers project be, and the same is hereby suspended until further action of this Commission; and it is

"FURTHER ORDERED, that the questions heretofore raised with respect to the issuance of the permits on November 10, 1972, together with all matters pertinent to Commission consideration of requests for water and sewer permits, including (but not limited thereto by reason of such specificity) information as to sewage flow calculations and projections at the time of such further action, *shall be considered at the time of the further review indicated by the County Executive's action* and by

8. Mr. Elliott, one of the three members of the Commission from Prince George's County, was appointed to it by the County Executive with the approval of the County Council. *See* Maryland Manual, 1973-74.

the Commission's within order. . . ." (Emphasis supplied.)

Following the adoption of this Order, a copy of which was not mailed to the Blumbergs until April 13, Elliott left a message for Mr. Morris that the Commission "had acted upon the County Executive's Office request."

It is evident at a glance that the advice given to the Commission of Gullett's intentions, as recited in its Order, is wholly inconsistent with that conveyed to the Blumbergs in Mr. Novak's letter. Under the Novak letter, all the Blumbergs had to do to regain the building permit was to show that they were, in fact, licensed.

The county resolved this inconsistency, to Blumbergs' detriment, on April 19 (two days after it issued the annual contractor's license). Mr. Novak sent a "follow-up" to his earlier letter, stating, in part:

"On April 13, 1973, the Washington Suburban Sanitary Commission ordered that the efficacy of the permits issued by WSSC with respect to water and sewer service is suspended until a Petition for Writ of Mandamus and an Injunction indicating that compliance with the FAA regulations has not been achieved.

"Therefore, these two (2) additional items of concern must be resolved for legal reissuance of the building permits to take place." [9]

What was afoot here was not lost upon the Blumbergs. Following receipt of Novak's letters, Marvin Blumberg went to see Mr. Gullett. According to Blumberg's uncontradicted

---

**9.** This letter is, of course, remarkably incoherent. The WSSC action referred to was apparently that taken on April 11, 1973; the record reveals no further or other action by WSSC on April 13, except to mail a copy of the April 11 Order to the Blumbergs. The suspension ordered by WSSC said nothing about a Petition for Mandamus, and injunction, or FAA (Federal Aviation Administration) regulations. Testimony supplied by Novak indicated that, in the frantic search for reasons to stop this project, someone suggested that FAA approval was needed for a building of this height. Except for a cursory review of the zoning ordinance, neither Novak nor anyone else bothered to determine whether, in fact, such approval was necessary and, if necessary, could be obtained. The reference to mandamus and injunction remains a mystery to the Court.

testimony, Gullett made clear that the problem was the height of the building. Blumberg offered to revise the project either to reduce the height of the two towers to 27 stories, or to build three towers of 20 stories each. Gullett, according to Blumberg, agreed to the first alternative, whereupon the Blumbergs started work on revising the plans to reduce the height of the larger tower,[10] obtained approval of the revision by the Maryland-National Capital Park and Planning Commission, and thereafter, on May 8, 1973, filed an application for a revised building permit.

The charade continued, however, as the Blumbergs were spun around once more. When the county declined to process the revised application, the Blumbergs contacted Gullett again. This time, they were told that WSSC was holding it up "and he couldn't do anything about it." So they went back to WSSC, which conducted what it termed a hearing and what the Blumbergs called "a great show" on May 23. On May 30, 1973, it issued another Order (which it declined for some unexplained reason to release until June 4, 1973), in which the Commission (1) claimed that it didn't know what it was doing on October 25, 1972, when it adopted Resolution 73-080 and also authorized the Blumberg permits,[11] (2) treated the revised application for building permit as a new proceeding, notwithstanding that the same 600 units (or less) were involved, and thus considered the earlier permits to be "moot", and (3) decided that "capability problems in [the] Anacostia Basin system" and delays in the expansion of the Blue Plains Treatment Plant "militate against and preclude a finding at this time, on the basis of the material adduced upon the record on May 23, 1973, 'that Sewer service is available." Accordingly, in its operative sections, the Order withdrew the earlier permits and ordered a notation placed

---

10. It will be recalled that the second building permit, which became part of the third, already called for one 27-story tower.

11. The actual language was that "the written record of the Commission's meeting of that date is not clear", and that the language of Resolution 73-080 "does not fully comport with the said authorizing instructions, and, moreover, created an inadvertent discrepancy between the authorizing instructions intended to be covered by that Resolution and earlier Commission resolutions concerning sewer service limitations in the Anacostia Drainage Basin."

on the county building permit application, "Sewer and Water service availability not present at this time."

The Kafkaesque drama was now complete. Under § 4-230 of the County Code, that determination precluded reissuance of the building permit. Building upon an erroneous, and clearly spurious, assumption that the Blumbergs were not licensed as contractors, the county and the Commission, in tandem, managed to revoke building, water, and sewer permits (without even offering to refund the substantial fees paid for them) and thus leave the Blumbergs with an enormous construction project in which they had invested a great deal of time and money, and could not complete. On July 10, 1973, they filed suit for injunctive and declaratory relief.

With this background, we turn now to the legal issues before us, beginning with those raised by Prince George's County.

(1) Was The Circuit Court Without Jurisdiction Because The Blumbergs Failed to Exhaust A Statutorily Prescribed Administrative Remedy?

The question here is whether, as a prerequisite to judicial review, the Blumbergs were obliged to present their grievance against the county to the County Board of Administrative Appeals.

Through Md. Annot. Code art. 25A, § 5 (U) — part of the "Express Powers Act" — the General Assembly has authorized charter counties, by local law, to provide for the establishment of a county board of appeals. Section 5 (U) further authorizes the county to provide,

"for the decision by the board on petition by any interested person and after notice and opportunity for hearing and on the basis of the record before the board, of such of the following matters arising (either originally or on review of the action of an administrative officer or agency) under any law, ordinance, or regulation of, or subject to amendment or repeal by, the county council . . . [:] the issuance, renewal, denial, revocation, suspension, annulment, or modification of any . . . permit. . . ."

The statute goes on to permit judicial review of the board's decision, and concludes with the statement: "The review proceedings provided by this subsection shall be exclusive."

Pursuant to this authorization, Prince George's County, by ordinance, created a Board of Administrative Appeals and authorized it to "hear and determine all administrative appeals allowed by ordinance or law" with exceptions not relevant here. *See* 1972 County Code, § 2-117. More particularly, § 4-242 of the County Code provided that:

"The owner or occupant of a building or structure or any directly aggrieved person may appeal to the Board of Administrative Appeals *from a decision of the Building Official refusing to grant a modification of the provisions of the Basic Code or of this Sub-title.*[12] Application for appeal may be made when it is claimed that the true intent of the Basic Code or of this Subtitle has been incorrectly interpreted or applied." (Emphasis supplied.)

Section 4-242 further authorized the Board to "vary the application of any provision of the Basic Code or this Subtitle to any particular case when, in its opinion, the enforcement thereof would do manifest injustice, and/or would be contrary to the spirit and purpose of the provisions herein or the public interest, or when, in its opinion the interpretation of the Building Official shall be modified or reversed."

The county's argument is this: (1) the Blumbergs are complaining that Mr. Novak had no authority to revoke the building permit, and no right to refuse to reissue it; (2) the relief sought, aside from damages, is an order directing Novak, or his successor, to reissue the permit; (3) Novak acted in the belief that because the Blumbergs had failed to comply

---

12. The Prince George's County Building Code is set forth in subtitle 4 of the County Code. It consists primarily of the Basic Building Code published by the Building Officials and Code Administrators International (BOCA) — referred to as the "Basic Code" — and the amendments made to the Basic Code by the county council. Except for a short provision adopting the Basic Code by reference, subtitle 4 consists mostly of the specific amendments to that code, one of which is § 4-242, which added a new § 128 to the Basic Code. The term "Building Official" was defined to mean the Chief Building Inspector of the Department of Licenses and Permits (current County Code, § 4-103) — *i.e.,* Mr. Novak.

with the contractor's license law, and because WSSC had suspended and later revoked the water and sewer permits, a building permit was barred by § 4-230 of the County Code; [13] (4) his decision and action was therefore based upon an interpretation and application of the Basic Code, as amended; and (5) there is a special, and therefore exclusive, remedy for testing that decision and action, and seeking relief from it — namely, a petition to the Board of Administrative Appeals under § 4-242.

There is a rule, of course, well established in the law, that a litigant must exhaust his available administrative remedies before applying for judicial relief; equally well established, however, are some exceptions to the rule. In *State Dep't of A. & Tax. v. Clark,* 281 Md. 385, 403 (1977), the Court of Appeals put it this way:

> "We have indicated . . . that when an administrative remedy is provided by statute, relief provided under those statutory provisions must be exhausted before a litigant may resort to the courts. That is, such a remedy is exclusive, and the administrative body must not be by-passed by pursuing other remedies. . . . However, '[t]here are few absolutes in the law, and the rule that an administrative remedy must be exhausted before recourse is had to the courts is not one of them.' " (Citations omitted.)

*See also Poe v. Baltimore City,* 241 Md. 303 (1966).

Since it does not appear from the record extract that the county raised the exhaustion question of any of its pre-trial pleadings, we shall have to judge whether the doctrine, or an exception to it, applies based upon the evidentiary record

---

**13.** Section 4-230 provided in relevant part: "A building permit *shall not be issued* under the provisions of the Basic Code and of this Subtitle unless and until there has been full compliance with the applicable requirements contained therein, and with all statutes, ordinances and regulations containing provisions related to and essential to the safety, health, sanitation and welfare of the occupants or future occupants of any building, structure or premises. . . ." (Emphasis supplied.) The section says nothing about revoking or suspending a permit already issued.

made in the lower court, rather than upon just the allegations in the bill of complaint and amended bill of complaint.[14]

The doctrine that requires a complainant to exhaust his administrative remedies before invoking the aid of a court traditionally rests upon two bases: one is pragmatic, the other more fundamental. From a pragmatic point of view, administrative agencies are given the first opportunity to resolve a dispute (that is within their jurisdiction) because (1) they are presumed to have an expertise in the matter not possessed by courts, and (2) if given an opportunity to exercise that expertise, they may obviate all or part of the need for a judicial resolution. The more fundamental reason is simply that when a legislative body validly provides a special means of resolving certain disputes, it is incumbent upon the courts to follow the law and to respect and enforce that procedure. All of this, however, is subject to the underlying premise that an *adequate* administrative remedy does, in fact, exist; for, if there is no such remedy available, there is nothing to exhaust and neither purpose for the doctrine would be served.

It is in this context and in light of the further requirement in § 4-242 of the County Code that a notice of appeal to the Board must be filed within 30 days "after the decision is rendered by the Building Official" that we judge the county's argument.

The first grievance afforded the Blumbergs was Mr. Novak's letter of April 12, 1973, declaring the building permit null and void because of a failure to have a contractor's license. That determination could have been appealed to the Board; but, since the letter made clear that the permit would be reissued as soon as proof of licensure was established, there was no need to file such an appeal. The Blumbergs, in fact, were licensed; and, based upon the letter, once they exhibited their license to Novak the permit would be reissued

14. As no one has raised the issue either below or in this Court, we shall not comment on whether the exhaustion argument should have been raised *by written motion,* either preliminarily under Maryland Rule 323 upon the premise that it went to the Blumbergs' capacity to sue, or otherwise upon the premise that it was a jurisdictional defense. *See* Maryland Rule 321 dealing with motions.

and that would be the end of the matter. Why waste a $100 filing fee for an unnecessary appeal?

The letter of April 19 presented a more serious dilemma. Here, Novak, on orders from his supervisor Gershenow, in turn on orders from the County Executive (at whose pleasure he served — *see* Prince George's County Charter, Art. IV, § 402, Art. V, §§ 501, 504, 407), indicated that the permit would not be reissued until the "efficacy" of the WSSC permits was restored, certain court proceedings were resolved, and compliance with unspecified FAA regulations was assured. Here was a "Catch-22" masterpiece. WSSC had suspended the efficacy of its permits solely at Gullett's request and because the county had lifted the building permit; no other reason was given or suggested in the Commission's April 11 order or in Chairman Elliott's testimony. Now, the county was delaying (not denying, only delaying) reissuance of the building permit until the WSSC reinstated its water and sewer permits. What appeal lay from that?

The county concedes that the Board of Appeals had no authority whatever to require WSSC to reinstate the efficacy of its water and sewer permits. *See Board of Appeals v. Marina Apts.,* 272 Md. 691 (1974). That impotence alone made an administrative appeal essentially worthless, especially in light of the Commission's subsequent Order of May 30, 1973; even if the Board were able to direct, and did in fact direct, Novak to reissue the building permit, the Blumbergs would have been virtually in the same helpless position.

It seems highly questionable, moreover, whether the Board had statutory jurisdiction even to entertain an appeal. All that Novak said in this April 19 letter was that the WSSC permits and two other "items of concern" would have to be resolved before reissuance of the building permit. Especially in light of Gullet's assurances that if the height of the building was reduced the permit would be reissued, however, this was *not* a "final decision of the Building Official refusing to grant a modification of the provisions of the Basic Code or of [Subtitle 4]", which is the only basis for an administrative appeal under § 4-242.[15] For one thing, from the letter itself, it was not a

---

15. It would appear that § 4-242 is the only operative provision dealing with appeals to the Board with respect to building permits. Art. 25A, § 5 (U)

*final* decision by anyone. Secondly, based upon the testimony of Novak and Gullett, it was clearly not Novak's decision, but that of Gullett. And it had nothing whatever to do with modifying the provisions of the county building code.

It seems clear, therefore, that resort to the Board of Appeals would have been entirely fruitless. Section 4-242 says nothing about appeals from a patently political decision of the County Executive. We conclude, therefore, that the circuit court did have, and did properly exercise, jurisdiction. There was no adequate administrative remedy to be exhausted.

(2) Did Prince George's County Commit An Unlawful Act To the Injury Of Appellees In This Case?

The county here contends that its revocation of the building permit was lawful, and that it should not be held responsible for anything improper that may have been done by WSSC. We shall examine these interesting arguments.

In support of its first claim, it says: (1) CB 77-1972 provided that a residential building permit "shall not be issued to any person except a duly licensed building contractor", (2) when the permits in question were issued, the Blumbergs were not so licensed, (3) such permits were therefore void *ab initio* and conferred no rights whatever on the Blumbergs, and (4) consequently, the county's action of April 12, 1973, was perfectly legal.

The Court of Appeals, it is true, has stated on a number of occasions that a municipal authority is not estopped from asserting the invalidity of a building permit that was erroneously and unlawfully issued — that such a permit confers no rights upon its holder. *See, for example, Lipstiz v. Parr,* 164 Md. 222 (1933); *Berwyn Heights v. Rogers,* 228 Md. 271 (1962); *Kent County v. Abel,* 246 Md. 395 (1967); and *cf. City of Hagerstown v. Long Meadow,* 264 Md. 481 (1972).

---

of the State Code is merely an authorization for the county to create and provide for the jurisdiction of the board; it does not, itself, create such a board or vest jurisdiction in it. The local law that implemented § 5 (U) and actually created the Board (§ 2-117) merely allowed it to hear administrative appeals "allowed by ordinance or law". Section 4-242 is the only such ordinance or law to which our attention has been directed.

Those cases, however, and others reaching similar conclusions, involved not merely a defect in the issuance of the permit, but rather a situation in which the project authorized by the permit was itself illegal. In each case, the proposed structure was prohibited by the applicable zoning ordinance. The illegality was not in the permit or the manner of its issuance, but rather in what it purported to authorize; and that illegality was a continuing one.

Such is not the case here, of course. Not only was there no defect in the project, but by April 12, 1973, there was nothing illegal about the permit either. Whatever violation had existed when the permit was first issued had already been cured. The "void *ab initio*" theory has no relevance at all to this case.

The county, ever resourceful, seeks to dismiss the annoying fact that the alleged violation had already been cured and that the Blumbergs were in fact in compliance with the law when their permit was suspended by asserting, as though it had some significance, that the Blumbergs had neglected to amend their application to reflect their subsequent licensure. This disingenuous *non sequitur* fails to account for the fact that nowhere in either the licensure law or the building code is there any requirement that such information be reported on an application for a building permit (much less that an application validly filed prior to enactment of the new law had to be retroactively amended).[16] The simple fact is that the county law defines very carefully the limited grounds for suspending or revoking a permit, and none of those grounds authorized, or were relied upon in, the April 12 suspension.[17]

We turn then to the question of whether the lifting of the building permit became lawful because of the intervening

---

**16.** Section 113.2 of the BOCA Basic Code provides that an application for a permit "shall be *submitted* in such form as the building official may prescribe. . . ." (Emphasis supplied.) We do not construe this provision as authorizing a suspension or revocation of a permit because an application did not contain that which was *not* prescribed when the application was first submitted.

**17.** Section 114.2 of the Basic Code authorizes suspension for failure to commence and pursue the work; § 114.6 authorizes revocation for misrepresentation in the application or the plans upon which the permit was based; and an amendment to § 114.6 authorizes revocation for failure to locate utility lines.

action of WSSC. Ordinarily, there would be a semblance of merit to this aspect of the county's argument: absence or valid withdrawal of the WSSC water and sewer permits might, under § 4-230 of the County Code, justify the non-issuance, or even the suspension, of a building permit. But where, as here, the evidence established that the action of WSSC on April 11 — the only action that was relied upon in the county's letter of April 19 — had been orchestrated by the County Executive and was based solely upon the fact that the county had (wrongfully) suspended the building permit and had itself requested WSSC to take comparable action, the county will not be heard to lay the blame on WSSC and thereby justify an action that was otherwise wholly unjustifiable. Quite apart from the shared culpability of WSSC, an issue we shall discuss later in this Opinion, the county cannot hide behind actions of WSSC that it, the county, deliberately set in motion.[18]

The answer to the county's second question, therefore, is "yes"; it did commit an unlawful act to the injury of appellees.[19]

### (3) Governmental Immunity

The county here asserts that even if, *arguendo*, revocation of the building permit was wrongful — even if based, as it says, "on an erroneous interpretation of County law or political motivation", nevertheless, because the culpable county officials acted in a discretionary governmental capacity, the county is not answerable in damages for their wrongful acts. They seek support for this conclusion from *Carey v. Baltimore County*, 262 Md. 491 (1971), and *Bradshaw v. Prince George's County*, 284 Md. 294 (1979).

---

18. In final desperation, the county seeks to escape responsibility for the wrongful acts of Mr. Gullett by asserting that they were *ultra vires* and should not bind the county. It overlooks, however, the complicity of Messrs. Gershenow and Novak and the supporting role of the County Law Department. This was not a "one man show."

19. The county contends that the Blumbergs did not proceed in good faith and did not perform enough work in reliance on the permit to obtain a vested interest. The evidence, however, is quite to the contrary. In addition to all of the planning, design and site preparation work, a substantial amount of concrete had been poured by April 12. This was clearly more than "window dressing". *Compare* Pemberton v. Montgomery County, 275 Md. 362 (1975), and Ross v. Montgomery County, 252 Md. 497 (1969).

We start with the proposition that, except for the doctrine of governmental immunity, a county is in the same position as anyone else whose wrongful acts cause damage to another person. Its only shield is the immunity it possesses as a governmental entity.

In 1970, Prince George's County adopted a charter form of government. Included in its first charter, which became effective in February, 1971, was § 1013, which provided as follows:

"Governmental Liability. The County may be sued in actions sounding in tort in the same manner and to the same extent that any private person may be sued. The County shall carry liability insurance with adequate limits to compensate for injury to persons or damage to property resulting from negligence and other wrongdoings of its officers, agents, and employees. Nothing herein shall preclude the County from meeting the requirements of this section by a funded self-insurance program."

In *Bradshaw v. Prince George's County, supra,* the Court of Appeals held this provision to be a valid and effective waiver of the county's governmental immunity, not only with respect to its own corporate acts, but also for the "actionable tortious conduct" of its officers "for which liability can be imputed to the County." 284 Md. at 302. The Court went on, then, to discuss the circumstances under which such vicarious liability might exist. *Bradshaw* involved the actions (or non-action) of police officers, whom the Court concluded were in the status of "public officials". Public officials, said the court, have a qualified immunity of their own, which is independent from that of the county, and rests upon a different basis. They are "protected by a qualified immunity against civil liability for *non-malicious acts performed within the scope of [their] authority.*" *Id.* at 303. The key ingredients of this immunity are (1) the absence of malice, and (2) acting within the scope of authority. Public officials, in other words, have no liability for mere negligence.

The "bottom line" of *Bradshaw* is that there can be no

vicarious liability on the part of the county unless there is primary liability on the part of the public officials whose conduct created the injury. Indeed, the actual decision in *Bradshaw* affirming summary judgments in favor of the county and the individual officers was based on the fact that the plaintiff had not alleged either malice or an abuse of authority on the part of the officers.

This case proceeded upon an amended bill of complaint, filed in October, 1976, in which the Blumbergs sued not only the county and WSSC, but Gullett and Kelley as well. No other officials or employees of the county or WSSC were sued. As to Gullett, it was alleged that (1) he was the County Executive, (2) in that capacity he had "direct control" over the Department of Licenses and Permits and thus over the processing and issuing of building permits, (3) neither he nor any other official had authority to revoke a building permit except for fraud or misrepresentation (Basic Code, § 114.6), (4) although the Blumbergs complied with the April 12 directive, Gullett and the county refused to reissue the permit, and (5) a revised application for a 27-story structure was filed "upon representation by the Defendant Gullett that a building permit would be issued if the height of the 35-story building were reduced accordingly."

That constitutes the sum and substance of the pleaded allegations against Gullett, and indeed against any of the individual county officials.[20] There was no direct allegation of malice on the part of anyone, and, as noted, the only *specific* complaint against Gullett that smacks of an excess of authority was that he refused to reissue the permit.

A full year after the amended complaint was filed, Gullett and Kelley filed a demurrer in which they asserted that they were not proper parties to the action, that they acted lawfully "in refusing to issue" building permits, and a number of special defenses not relevant here. They did not interpose their immunity or suggest that a cause of action had not been alleged (except to the extent of their claim that they were not

---

20. Except to name him as the then current County Executive, the amended bill made no allegations whatever against Kelley. Novak was mentioned as merely the author of the April 12 letter.

"proper parties" to the action). After a hearing, the court
sustained their demurrer on the grounds that (1) the plaintiffs
"have lost nothing of consequence" and (2) there were no
allegations that would entitle the Blumbergs to a judgment
against them separate and apart from any judgment they
might obtain against the county. The court stated further that
because of its doubt that the Blumbergs "can amend to state
a cause of action against these two men individually or would
even want to do so if the Court gave them permission to do
so", the demurrer would be and was sustained without leave
to amend.

The Blumbergs have challenged the correctness of this
ruling in their cross-appeal, but because it is germane to the
issue raised by the county, we shall consider it here. They
assert that the amended complaint *did* state a cause of action
against Gullett and Kelley, and that, in concluding that it did
not, the court erred both in substance and by relying on a
ground not raised in the demurrer. It is true that the
demurrer, and the court's expressed reason for sustaining it
could (and should) have been more precise; but there is no
doubt that the ruling was correct. The amended bill simply
did not state a cause of action against Gullett or Kelley (or
any other county official), and they were therefore properly
dismissed. With respect to the preclusion of further
amendment, the printed record does not reveal that the
Blumbergs ever asked for leave to amend or objected to the
court's denial of such leave. Accordingly, even if that aspect
of the ruling would have amounted to an abuse of discretion
under the principles recounted in *Hertelendy v. Montgomery
Cty.*, 245 Md. 554, 566 (1967), the issue has not been preserved
for appellate review.

From this, it might be argued that, as no cause of action
lay against Gullett or any other county official, there could
be no vicarious liability against the county. Indeed, this would
seem to flow quite naturally from what the Court said in
*Bradshaw.*

But things are never so easy. For whatever reason, the
county never raised in the lower court the issue of its
governmental immunity. It not only filed no pre-trial pleading

asserting such a defense, but, at the conclusion of trial on the issue of liability, its counsel acknowledged that it was not interposing that defense. Under Maryland Rule 323 b, of course, a motion raising governmental immunity may be filed at any time, including on appeal; and, although it does not appear that the county has ever raised the defense by *motion,* as seemingly required by Rule 323, we shall nevertheless consider the argument.[21] In doing so, however, we shall, in terms of the *county's* liability, look not solely at what was alleged in the amended bill as we would be obliged to do had the defense been raised prior to trial, but at what was shown *at trial.* We know of no other way to fairly mesh Maryland Rules 323 b and 1085. If we are to consider the defense initially on appeal, in fairness to appellees and to the trial court, we must do so on the basis of the entire record before us.

The question, then, is whether the circuit court found that any county public officials acted maliciously or in excess of their authority and, if so, whether there was sufficient evidence to support that finding. If so, the prerequisite for vicarious liability is present.

In announcing its findings and decision as to liability, the court never used the word "malice"; but it is clear that that is precisely what the court found. In describing the impetus for lifting the permit, the court said:

"And just as positively as I am sitting in this chair,

---

21. There is a seeming conflict with respect to Rule 323 b that should be pointed out and resolved. Prior to April, 1976, the Rule purported to require the defense of governmental immunity to be raised preliminarily; however, in Bd. of Education v. Alcrymat Corp., 258 Md. 508 (1970), the Court held that, because the defense was one that could not be waived except pursuant to legislative enactment, it could be raised at any time, including on appeal, notwithstanding the Rule. The Court thereupon conformed the Rule to its decision by permitting the defense to be raised "at any time." In doing so, however, it may have omitted consideration of Maryland Rule 1 a, which plainly states that the Chapter 300 Rules (including Rule 323) do not apply to appellate proceedings. Nonetheless, and without mentioning Rule 1 a, the Court, in Board v. John K. Ruff, Inc., 278 Md. 580 (1976), and particularly in footnote 2 at page 583, made clear that the phrase "at any time", as used in Rule 323 b was intended to include, and did indeed include an appellate proceeding. Although the law is clear by reason of the *Ruff* decision, the Court may wish to consider the apparent conflict between that decision and Rule 1 a.

if I had been standing beside him and watched him do it, Mr. Gullett took into assessment how many votes were involved in this project, and since dollars don't vote and people do, the Blumbergs lost out.

"Mr. Gullett suddenly was going to stop that program, notwithstanding his previous endorsement, and notwithstanding the fact that he thinks it's great for Prince George's County, that it's just what the County needs, that it's going to save the County from the vise (sic) of garden apartments, and exactly what the tax base needs and everything else. No. If there is any way to stop it, we are now going to stop it."

The court then characterized the reason picked by Gullett and his county solicitor as "part of a flimsy legal excuse for taking action which wasn't based on that reason at all, but on an entirely different reason which was an improper one...." Continuing, the court discussed Gullett's role in persuading WSSC to take consistent action, noting: "We don't think that government ought to act with such a demonstrated lack of integrity, and we think that the principle of law that a person has the vested right in a permit such as this was designed to protect the citizen who does everything that he is supposed to do from the arbitrary and capricious whims of political winds in the area."

There is no doubt that this added up to a finding of malice; nor is there any doubt that the evidence supported such a finding.

Malice is one of those concepts that can be defined in many ways. There are 77 pages in *Words and Phrases* devoted just to that one word. It means one thing in the law of defamation, another thing in the context of authorizing punitive damages, and something else again in general tort and criminal law. In *Cumberland Glass Mnf'g Co. v. DeWitt,* 120 Md. 381, 392 (1913), the Court of Appeals held that, in terms of malicious interference with contractual relations, malice "does not mean actual malice, or ill will, but consists in the intentional doing of a wrongful act without legal justification or excuse." *See also McCarter v. Chamber of Commerce,* 126 Md. 131, 136

(1915); *Stannard v. McCool*, 198 Md. 609 (1951). The court later applied the same definition to malice in a criminal context. *See Chisley v. State*, 202 Md. 87, 105 (1953); *Rosenberg v. State*, 164 Md. 473 (1933). Indeed, except in those special types of cases where some more restrictive element is required, this seems to be the most common definition applied in tort cases — where civil liability is based upon malicious conduct. *See, for example, Bliss v. Southern Pac. Co.*, 321 P.2d 324 (Ore. 1958); *O'Brien v. Howell*, 92 So.2d 608 (Fla. 1957); *Smith v. Moran*, 193 N.E.2d 466 (Ill.App. 1963); *Wegiel v. Hogan*, 100 A.2d 349 (N.J. Super. 1953); *Jones v. Citizens Bank of Clovis*, 265 P.2d 366 (N.M. 1954); *Hedman v. Siegriest*, 248 A.2d 685 (Vt. 1968); *Childress v. Abeles*, 84 S.E.2d 176 (N.C. 1954); *Davis v. Nash Central Motors*, 332 S.W.2d 475 (Mo.App. 1960); *Beardsley v. Soper*, 171 N.Y.S. 1043 (1918); *Jones v. Hebdo*, 106 S.E. 898 (W.Va. 1921). *See also* 26 *Words and Phrases* 220-225.

We see no reason to depart from that standard in judging the liability of a public official. If such a person intentionally does something that he knows is wrong, that he has no legal justification to do, and that causes injury to another person, he is and ought to be answerable in damages.

Applying that standard here, we are, of course, aware that the issuance and revocation of permits, like many other governmental acts, involves the exercise of governmental discretion to which tort liability does not ordinarily attach. *See, for example, Carey v. Baltimore County*, 262 Md. 491 (1971). Mere errors of judgment, whether occasioned by negligence or otherwise, are not actionable. But when that act, ordinarily discretionary and therefore protected, is done knowingly and deliberately, for an improper motive, and without legal justification, it becomes more than an error in judgment. It becomes malicious.

There is no question that Gullett orchestrated what occurred, that he had no authority whatever to do it, that he did it for wholly improper reasons, and that he did it deliberately, knowing full well the consequences of his actions. The evidence fully supports the court's conclusions that he acted arbitrarily, capriciously, with a lack of integrity,

and for improper motives. The prerequisite to the county's liability under § 1013 of its charter was therefore satisfied, notwithstanding that Gullett, personally, was properly dismissed on demurrer.

(4) Suspension of Maryland Rule 530

The county complains that the court improperly suspended the operation of Maryland Rule 530 at a time when there had been no proceedings of record for some 23 months. A decision to suspend, or not suspend, operation of the Rule is discretionary with the trial court, and, absent a clear abuse of that discretion, its decision will not be disturbed on appeal. *Langrall, Muir & Noppinger v. Gladding,* 282 Md. 397 (1978). We find no such abuse in this case. Much of the delay was occasioned by the laudable, but fruitless, efforts of the Blumbergs to settle the case.

(5) Claims With Respect to Damages

The county asserts that the Blumbergs are barred from collecting money damages by reason of (1) the statute of limitations, (2) laches, and (3) their failure to give notice to the county as required by Md. Annot. Code art. 57, § 18. In addition, it claims that, if entitled to damages at all, they are limited to $250,000, and that the court erred in its calculation of the amount of damages.

The limitations and laches argument is based on the fact that the Blumbergs' original bill of complaint, filed in July, 1973, asked only for injunctive relief requiring the county to reissue the building permit, and made no claim for monetary damages. The damage claim first appeared in the amended complaint filed in October, 1976, more than three years after the cause of action — the wrongful revocation — arose.

The original complaint, in 39 paragraphs, alleged the basic history of what had occurred, averred that the Blumbergs had acquired vested rights in the respective permits, and asserted that their suspension or revocation amounted to a denial of due process and equal protection. In paragraphs 38 and 39, the Blumbergs complained that they were incurring "on-going costs", that subcontracts amounting to nearly $284,000 were being jeopardized, and that because of the

delays additional construction costs and loss of income from the project would be sustained. They asked for a "prompt hearing on the merits" of their bill and, ultimately, for an injunction requiring reissuance of the permits.

A flurry of activity followed the filing of this complaint. There were motions to intervene, motions raising preliminary objection, answers, extensive discovery. Then, abruptly, activity ceased in February, 1974, and the case lay dormant until the threatened application of Maryland Rule 530 in January, 1976. The rule was suspended, as noted earlier, largely upon the basis that the Blumbergs were making earnest and reasonable attempts to settle the controversy with both WSSC and the county. These efforts were confirmed by the trial testimony of Marvin Blumberg.

When it became apparent that an amicable resolution was not likely, the Blumbergs, whose losses had, of course, increased in the intervening period, filed their amended complaint in October, 1976. This amended bill repeated verbatim, or nearly so, the 39 paragraphs in the original bill. It added four additional paragraphs to the end, only one of which is relevant here. Paragraph 40 alleged that, due to the revocations, the Blumbergs had been unable to enforce their contracts, causing an increase in construction costs of between 10% and 12% a year, and that the cost of the building had already grown from $20 million to $26 million. In their prayers for relief, the Blumbergs also added two new paragraphs, one seeking $4.5 million in compensatory damages and one seeking $500,000 punitive damages.

The county asserts that this additional claim for damages represents a new cause of action barred by limitations. The rule in this regard was stated by us in *Myers v. Aragona,* 21 Md. App. 45, 51 (1974): "if an amendment sets forth a new cause of action, then limitations is measured from the time of the accrual of the cause to the date the amended declaration is filed, but if the amendment does not state a new cause of action, then limitations is determined with reference to the date of the original filing."

It is clear from a comparison of the two bills that no new cause of action has been pled. All that has been added,

proceeding upon the same alleged wrongful acts and the same theory of recovery, is an enlargement of the relief prayed. It is stated in 54 C.J.S., *Limitations of Actions,* § 282, that "[a]n amendment enlarging the prayer of the petition, or the remedy sought, in order to enable the court to award the relief to which the plaintiff is entitled on his cause of action, does not introduce a new cause of action so as to be subject to a plea of limitations." The few cases considering the question support that statement. *See Davison v. Martin K. Eby Const. Co.,* 218 P.2d 219 (Kan. 1950); *Smith v. Wilder,* 120 So.2d 871 (Ala. 1960); *Johnston v. Percy Const., Inc.,* 258 N.W.2d 366 (Iowa 1977). Accordingly, the claim for damages asserted in the amended bill, being an emanation of the same cause of action asserted in 1973, relates back to the time of filing of the original bill and is not barred by limitations.

Neither is it barred by laches. The county's argument here proceeds not from a delay in *filing* the claim for damages, but from the delay in bringing the case to trial. This is much akin to an argument based upon Maryland Rule 530 without, in this instance, the benefit of the rule.[22]

Contrary to the assertions of the Blumbergs, "the mere institution of a suit does not of itself relieve a person from the charge of laches, and . . . if he fail in the diligent prosecution of the action the consequences are the same as though no action had been taken." *Taylor v. Carroll,* 89 Md. 32 at 36 (1899), quoting from *Johnston v. Standard Mining Co.,* 148 U.S. 360 (1893). *See also Hadaway v. Hynson,* 89 Md. 305, 313 (1899); *Rupp v. Rogers,* 118 Md. 534 (1912); *Stoewer v. Porcelain Etc. Mfg. Co.,* 199 Md. 146 (1952). Notwithstanding the statement of that principle, however, in fact the Court of Appeals has applied the doctrine very sparingly and only in rather severe circumstances once an action is filed. In *Taylor v. Carroll* and *Hadaway v. Hynson,* for example, 20 years of inactivity followed the filing of the complaint; and in *Stoewer,* the complaint lay dormant for 11 years. In *Rupp v. Rogers,* the complainant had waited 17 years to file her complaint and then allowed the action to

---

22. The proceedings relating to Maryland Rule 530 dealt with a dormancy occurring *prior* to the filing of the amended complaint.

remain dormant for two years, until the defendant had died. *Compare Hammersley v. Bell,* 134 Md. 172 (1919), where the Court declined to apply laches.

The problem addressed in these cases is more appropriately handled now by Maryland Rule 530; and, although it is certainly possible, where the circumstances warrant it, for laches to apply even before that rule would become operative, this is not such a case. The case was tried, as to liability, approximately 13 months after the amended complaint was filed, and, during the interim, the Blumbergs had to defend against a motion *ne recipiatur,* a motion raising preliminary objection, and two demurrers. As noted, the Blumbergs used the time to attempt settlement of the controversy, and their requests for postponement, which were approved by the court, were designed, at least in part, to facilitate that effort. Given the complexities and underlying currents in this case, not to mention the grossly inequitable conduct of the county that precipitated it, we do not think that the Blumbergs' claim should be barred by laches.

Prior to July 1, 1978, Md. Annot. Code art. 57, § 18 (a), stated that:

> "no action shall be maintained and no claims shall be allowed [against any county] for unliquidated damages for any injury or damage to person or property unless within 180 days after the injury or damage was sustained, written notice setting forth the time, place or cause of the alleged damage . . . shall be presented either in person or by registered mail by the claimant, his agent or attorney . . . to the . . . county council. . . ." [23]

By demurrer, filed one year after the amended bill of complaint, the county pointed out, and reargues in this appeal, that the Blumbergs are barred from collecting damages from the county because they failed to render the notice called for in § 18 (a). There is no question that the notice was not, in

---

[23]. By Laws of Md., 1978, ch. 770, all of § 18 of art. 57 was recodified as Courts article, § 5-306. One change in substance made by this act was to require that in Prince George's County, the notice be given to the County Executive rather than the County Council.

fact, given to the county council in the manner required by the statute.

The purpose of § 18 (a), said the Court in *Jackson v. Bd. of Co. Comm'rs,* 233 Md. 164, 167 (1963), was to provide the county "with sufficient information to permit it to make an investigation in due time, sufficient to ascertain the character and extent of the injury and its responsibility in connection with it." In *Neuenschwander v. Wash. San. Com.,* 187 Md. 67 (1946), and again in *Cotham and Maldonado v. Board,* 260 Md. 556 (1971), the Courts of Appeals held the requirement of notice to be mandatory and a condition precedent to recovering unliquidated damages. The effect of these rulings was ameliorated, however, by Laws of Md., 1972, ch. 519, which added a new § 18 (b). That section (now Courts article, § 5-306 (c)), conveniently ignored by the county, provided:

> "Notwithstanding the provisions of (a) above, the court may, upon motion and for good cause shown, entertain the suit even though the required notice was not given, unless provided further the defendant can affirmatively show that its defense has been prejudiced thereby."

Following the first interposition of this defense, in the county's October, 1977, demurrer, the Blumbergs moved for permission to claim damages, alleging, as good cause, that the original bill of complaint that was filed well within the 180-day period served as adequate notice to the county of the time, place, and cause of the alleged damages, and that the county had not been prejudiced by the lack of any other notice. *The county did not oppose that motion,* and, on November 20, 1977, the court granted it.

By failing to oppose the Blumbergs' motion, properly invoking the court's authority under then § 18 (b), the county has waived its right to complain on appeal that the motion was granted. Maryland Rule 1085. Even if we were to entertain the complaint, however, we would find it groundless. The county certainly had ample notice of the Blumbergs' complaint, and the probability that, unless resolved, substantial damages might accrue, within the

180-day statutory period. We fail to see how it was prejudiced in any way by the failure to give any other notice. In short, the court did not abuse its discretion in finding the presence of good cause and the absence of prejudice. *See Rolfe v. Clark,* 269 Md. 14 (1973); *Clark v. Wolman,* 243 Md. 597, 600 (1966).

We have already noted and discussed the provisions of § 1013 of the Prince George's County Charter, waiving the county's sovereign immunity. Part of the original charter that took effect in February, 1971, this provision contained no limitation on the amount of the county's liability, once its liability was established. It remained in effect as originally written until December 2, 1976, and was therefore the law when this cause of action arose, when the original bill of complaint was filed, and when the amended bill seeking a judgment for damages was filed.

On November 2, 1976, the electorate of the county ratified an amendment to § 1013 which, pursuant to § 1105 of the charter, became effective 30 days later. That amendment limits the county's exposure to $250,000 and permits the county to raise the defense of governmental immunity with respect to that part of a claim in excess of that amount.

The county does *not* contend that this charter amendment serves to limit the county's liability in this case. It contends that an amendment to Md. Annot. Code art. 25A, § 5, effective July 1, 1976, has that effect.

That section, as noted earlier, is part of the "Express Powers Act", authorizing the charter counties to enact certain types of local laws. By Laws of Md., 1976, ch. 825, the General Assembly added a new subsection (cc) to § 5, authorizing such counties:

> "To provide by ordinance or inclusion in the county charter for the waiver of sovereign immunity so that the county may be sued in tort actions in the same manner and to the same extent that any private person may be sued. Any chartered county *enacting legislation or otherwise waiving sovereign immunity under this subsection* shall carry comprehensive

liability insurance to protect itself, its agents and its employees. The purchase of this insurance shall be considered as for a public purpose and as a valid public expense. The liability of any county *under this subsection* may not be greater than $250,000 or the amount of its insurance coverage, whichever is greater, per individual per occurrence. A county which has adopted legislation or otherwise availed itself of the powers *contained in this subsection* may raise the defense of sovereign immunity to any amount in excess of the limit of its insurance coverage. In any case, the several counties or any county availing itself *of the privileges of this subsection* may not raise the defense of sovereign immunity in any claim of less than $250,000 or the amount of its insurance coverage, whichever is greater." (Emphasis supplied.)

The county's argument is that the 1976 charter amendment was adopted pursuant to this new § 5(cc), and that since § 5(cc) became effective July 1, 1976 — prior to the filing of the amended complaint — the limitation expressed therein controls in this case. The county overlooks the fact, however, that § 5(cc) is merely an authorization; it did not itself waive a county's sovereign immunity, and did not itself alter the previous waiver of that immunity by the people of Prince George's County. It merely permitted a charter county to enact local legislation consistent with its provisions. Until the county effectively did so, the original § 1013, which, as *Bradshaw* made clear did not emanate from or owe its validity to § 5(cc), remained in full effect. Accordingly, the entitlement of the Blumbergs to damages is not limited by § 5(cc) to $250,000.

Finally, the county contends that the court erred in its calculation of damages. The judgment was for $3,673,919, and consisted of three elements: (1) $373,919 for money expended on the project that is not recoverable, primarily payments to subcontractors and architects and the cost of constructing and demolishing model apartments; (2) $1,500,000 for the increased cost of capital necessary to complete the

construction, and (3) $1,800,000 for loss of earnings on the profits that would have been made had the building been constructed as scheduled.

The county does not dispute, in particular, the allowance or calculation of the first item. It does contest the other two.

These two items, totalling 90% of the judgment, were based upon the supposition that, with the direction that the permits be reissued, the building would be built and the Blumbergs would ultimately make a profit from it, either through the sale of condominium units or rents received from apartment units. The court concluded, as indeed the evidence showed, that it would cost more to construct the building in 1979 than it would in 1973, but that the extra cost of construction would be recouped in the higher amounts received from the sale or rental of units. That extra cost was therefore not awarded as damages. Neither was interest on the additional amount allowed, at least not directly.

The court observed that, in order to defray the higher cost of construction, additional capital would be needed, and, whether that capital was borrowed or contributed by the Blumbergs, there would be a cost attendant to it (either in interest if the money was borrowed or in loss of earnings if contributed as equity). Concluding that the law did not permit the awarding of interest directly,[24] the court decided to award an amount to compensate for the increased cost of capital. There was evidence in the case showing that between 1973 and 1978, interest *rates* on capital borrowed for apartment construction increased between 1% and 1⅜% (from 8⅛ to 8½% in 1973 to 9½% in 1978), and that the cost of that increase, applied to the same base amount borrowed (which other evidence showed would be $17,305,200) would, over the life of the loan, amount to between $1,308,175 and $2,083,347. The court somewhat split the difference and allowed $1,500,000 for that item. This represented, then, not interest on an additional amount that would have to be borrowed, but additional interest on the same amount due to the increased

---

24. *See,* however, Carrington v. Basshor, 119 Md. 378 (1913); Pasarew Const. Co. v. Tower Apts., 208 Md. 396 (1955); Jaeger v. Shea, 130 Md. 1 (1917).

cost of capital. "That is the value," said the court, "which [the Blumbergs) have lost because the capital would have been that much less expensive had this project gone up" as planned.

The $1,800,000 was based on the loss of time — the delay in the Blumbergs' *receipt* of their anticipated profits. There was evidence to show that the Blumbergs would have realized a profit of nearly $7,500,000 from the sale or rental of the apartment units and that that sum could have been invested by the Blumbergs at a rate of return of between 7% and 10%. Upon that premise, it was argued that the five-year delay occasioned by appellants' wrongful acts cost the Blumbergs between $3,000,000 and $4,500,000 — *i.e.,* five years income from the investment of that $7,500,000 profit.

The court accepted the theory proffered by the Blumbergs, but not some of the numbers. It said:

> "We are not prepared to say that we will allow as damages the interest on that profit for the entire length of time because we think it has to be reduced, number one, because part of the time we do not charge to the County, and, number two, because we are not sure that these men [*i.e.,* the Blumbergs] really felt that seven million dollars would be the exact profit they would make. We think there is enough evidence in this case indicating that there would have been a longer period of time before the selling of the property than they had perhaps hoped and Booz, Allen [Blumbergs' expert] had predicted."

The process by which the court arrived at $1,800,000 is somewhat unclear. It indicated that it would take "as an arbitrary figure" only half of the anticipated profit, which, as noted, the evidence showed would be approximately $7,500,000, but which the court referred to as $7,000,000. It then concluded that the county could not be "charged" with the entire five or six year delay, this being because of the court's doubt that the units could have been sold as quickly

as the Blumbergs anticipated. Upon that premise, the court, from the language it used, appeared then to halve again the amount of lost investment income claimed; but the figures don't match that approach.

The court said:

> "We, therefore, conclude that as an element of interest or earnings lost, we have accepted a figure of $3,600,000 as the interest which by any stretch of the imagination could have been earned *even if we diminished the whole business more than half.* We come up with a final figure of $1,800,000 for lost earning capacity on the money." (Emphasis supplied.)

The court did not indicate specifically what the $3,600,000 represented — where it came from. Was it intended to represent half (or less) of the anticipated profit of $7,000,000 — $7,500,000, all of which would then serve automatically to reduce the lost interest from the $3,000,000 — $4,500,000 range to half of that, or $1,800,000? Or did it, as the court seemed to say, represent the actual lost interest, which the court then proceeded to halve? The parties suggest that the court actually halved the claim twice, awarding only 25% of what the Blumbergs claimed; but our mathematics indicate that $1,800,000 is more than 25% of $3,000,000 — $4,500,000. It appears that the claim was halved but once.

The county attacks the $1,800,000 allowance on two grounds. First, it says that there was insufficient evidence to establish the marketability of the condominium units, from which the anticipated profits (and thus the loss of earnings on those profits) would arise. We disagree. The evidence supplied by the consultant firm of Booz, Allen & Hamilton, through the report of its vice-president Stephen D. Julius, was sufficient to permit a finding as to marketability, notwithstanding the contrary evidence supplied by the county's expert. Second, it contends that the court's calculation of the damages was arbitrary and speculative. In part because the court itself admitted that its assumptions

were arbitrary, and in part because we are unable to understand the actual process used by the court, we agree with the county on this point. The manner in which the court calculated the $1,800,000 was arbitrary and speculative, and we shall therefore remand the case for a redetermination of this element of damage.[25]

With respect to the $1,500,000, the county contends only that it represents a double recovery — that it represents an increase in cost of construction that will be recovered through higher sales or rental prices. We do not see that it is necessarily a double recovery, but we do feel that it is not an appropriate element of damage in this case because it is inconsistent with a more basic finding by the court. The court concluded that the Blumbergs would recoup the extra costs of construction through higher sales and rental prices, and would, in fact, ultimately realize the profit they reasonably could have anticipated. That is why no damages were allowed for loss of profits. We fail to see, however, how the additional cost of capital needed to defray the cost of construction is anything other than part of the overall enhanced cost of the project itself that also can be recouped. If there was sufficient evidence to show that, for whatever reason, this increment of the overall extra cost could *not* be so recouped, there would then be an element of lost profit that could be awarded; but, in the absence of such evidence, it is, we think, inappropriate to award damages specially for the higher cost of capital. Upon remand, therefore, the court may not include that element in a judgment for damages.

### (6) Conspiracy

In two separate but related arguments, the county urges that it is not vicariously liable because of the conspiracy of Gullett, WSSC, and various other people. We have already addressed the question of the county's liability, and the sufficiency of the evidence to support it; and we need say nothing further.

25. The county has not raised the underlying issue of whether this type of loss is properly recoverable as damages under any circumstances, and we therefore do not address or decide that question.

### (7) Appeal of WSSC

We leave now the issues raised by Prince George's County and consider the appeal of WSSC. It presents one issue: whether it was justified in suspending and later withdrawing its water and sewer permits.

The thrust of the Commission's argument is that the permits never should have been issued in the first place — that their issuance was in contravention of the various Resolutions the Commission had adopted and was induced by faulty advice given to it by its staff. It contends, as a result, that it had no authority to issue the permits and that, when given the opportunity to reconsider the matter following suspension of the building permit, it had no authority to allow the project to proceed. For this, it relies on our decision in *Rodgers v. Wash. Sub. San. Comm'n,* 32 Md.App. 664 (1976).

We find that case to be inapplicable to the situation before us, and we find the Commission's argument to be without merit.

It is true that, had the Commission denied the application and declined to issue the permits on October 25, its action would have been justified by and consistent with the four Resolutions. A building permit had not been issued, and the water and sewer permits had not been approved by the Commission in accordance with the Resolutions prior to August 2, 1972. However, unlike the Resolution apparently at issue in *Rodgers* (*see* 32 Md.App. at 666, 667), Section 3(c) of the August 23 Resolution authorized the Commission to waive or suspend the operative and inhibitory provisions of the Resolution "for good cause shown", in addition to the more specific exceptions stated elsewhere in the Resolution. This general "escape hatch" was not affected by the two subsequent Resolutions of October 4 and 25, and thus was fully operative when the decision was made to grant the permits at issue here. The Commission, therefore, was not precluded from approving and directing the issuance of the permits.

WSSC stresses, in support of its "mistake" argument, part of the testimony of its director of engineering, Mr. Stapp.

Stapp admitted that he believed that the Blumberg permits had been approved back in April, 1972, and that he probably conveyed that belief to the Commission when he met with it in executive session on October 25. From this, the Commission argues that it was given the mistaken impression that the permits had been authorized prior to August 2, and were not barred by the various Resolutions.

This argument overlooks the further testimony of Mr. Stapp that the Commission acted under the more general exception — ¶ 3(c) — rather than in error. It will be recalled that Mr. Stapp had sent a packet of material concerning the Blumberg application to each commissioner with a covering memorandum clearly pointing out that the application was still pending and had not previously been approved. He was asked, on recross examination, whether, to his knowledge, the Commission made a finding that there was good cause to make an exception with respect to the Blumberg application, and this colloquy ensued:

"A  I would say they must have.
Q  But did they to your knowledge?
A  They must have because they instructed that the projects be dealt with by the staff.
Q  That was based upon this report that you had given to the Commission, isn't that correct?
A  Based upon the information they had, yes.
Q  Your office provided that information to them?
A  Right, right."

From this, it is clear that there was evidence sufficient to warrant a finding that the Commission did not act in error, but, given the "hardship" status of the Blumbergs, the prior assurances given to them by staff personnel, the time, money, and effort expended by the Blumbergs in reliance on those assurances, and the recommendation of the staff, the Commission simply found good cause to waive the Resolution. Even if the Commission acted in error, however, because it had the ability to waive the Resolution, we cannot say that

the approval and ultimate issuance were illegal. That a government agency acts in haste, error, or confusion, and later regrets that it did so does not make its action, otherwise lawful, void.

From the testimony of Messrs. Gullett and Elliott, coupled with the language in the WSSC Order of April 11, 1973, the court was justified in concluding that the Commission's subsequent actions were unwarranted and unlawful. The Commission did not suspend "the efficacy" of the water and sewer permits because of any concern over water quality, or for any other legitimate purpose, but only in obedience to a patently political directive of the County Executive that the Commission Chairman felt it was his duty to follow. Had that improper act not occurred — had the Blumbergs been able to continue their construction activity at the pace described by Marvin Blumberg — it is doubtful that the further WSSC action of May 30 would ever have occurred.

Accordingly, although an opposite conclusion could have been reached, we do not believe that the court's findings as to the Commission's actions and motives were clearly erroneous or contrary to law. Its directive to WSSC to reissue the permits will therefore be sustained.

### (8) Liability Of WSSC For Damages

WSSC's initial response to the amended complaint seeking damages against it was a motion raising preliminary objection under Maryland Rule 323a 8 and 9 (want of necessary parties and governmental immunity). It alleged that, as to the issuance or non-issuance of permits, it was performing a governmental function, and that, with respect to the claim for damages, it enjoyed "sovereign and/or governmental immunity." WSSC reiterated this defense in a subsequent demurrer.

The court ruled against WSSC on the basis that the issuance of permits was a proprietary, rather than a governmental, function. Subsequent to this decision (but prior to its being reduced to a written order), this Court decided *Snyder v. State Dep't,* 40 Md.App. 364 (1978), *cert. den.* 284

Md. 748 (1979). In that case, based upon prior decisions of the Court of Appeals, we concluded that the determination to issue or revoke a permit is a governmental function, and that a municipality enjoying sovereign immunity for its governmental acts was not liable in tort by virtue of such a determination. Armed with this decision, after trial on the issue of liability, WSSC requested the court to reconsider its earlier decision. The court did so, and, on the basis of *Snyder,* granted WSSC's motion as to the question of damages. It concluded that, because WSSC was acting in a governmental capacity, it enjoyed governmental immunity and could not be held liable in damages.

Once again, however, an appellate court decided otherwise. In *Katz v. Washington Sub. San. Comm'n,* 284 Md. 503 (1979), the Court of Appeals held that WSSC was a *State,* not a municipal, agency, but that by § 1-3 of the Washington Suburban Sanitary District Code, the General Assembly had waived that immunity "with respect to tort actions." 284 Md. at 515.

WSSC attempts to avoid the clear import of *Katz* by suggesting a distinction between sovereign immunity, which it no longer has, and "performing a governmental function" which, it claims, still insulates it from responsibility. We fail to see the distinction in that context. In contrast to the situation with municipal agencies, the distinction between governmental and proprietary actions has no relevance with respect to the State or State agencies. *See Austin v. Mayor and City Council,* 286 Md. 51 (1979). Where sovereign immunity has been waived, the fact that actions are performed in a governmental capacity does not provide immunity where the actions are malicious or amount to an abuse of authority. *Bradshaw v. Prince George's County, supra,* 284 Md. 294. In light of *Katz,* and based upon the findings of the court and the evidence in support of them, we conclude that WSSC is answerable in damages for its wrongful acts. We shall therefore remand that part of the case to the circuit court for a determination of whether, and

to what extent, a judgment for damages should be entered against WSSC.

> *Orders directing Prince George's County and WSSC to reissue respective permits affirmed; judgment for damages against Prince George's County affirmed as to liability but reversed as to amount of damages; order dismissing action for damages against WSSC reversed; that order and judgment for damages against Prince George's County remanded to Circuit Court for Prince George's County for further proceedings in accordance with this opinion; order sustaining demurrers of cross-appellees Gullett and Kelley sustained; costs to be paid 1/3 by WSSC, 1/3 by Prince George's County, 1/3 by cross-appellants.*