66 F.3d 669
 41 ERC 1321, 64 USLW 2216, 33
Fed.R.Serv.3d 579,
25 Envtl. L. Rep. 21,587
 WESTFARM ASSOCIATES LIMITED PARTNERSHIP, Plaintiff-Appellee,
International Fabricare Institute, Defendant & Third Party
Plaintiff-Appellee,
v.
WASHINGTON SUBURBAN SANITARY COMMISSION, Third Party
Defendant-Appellant,
and
Prudential Insurance Company of America, Party in Interest.
 No. 94-1425.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 4, 1995.
Decided Sept. 27, 1995.
 
 ARGUED: Randall Matthew Lutz, Smith, Somerville & Case, Baltimore, Maryland, for Appellant. Jeffrey Moore Johnson, Dickstein, Shapiro & Morin, L.L.P., Washington, DC, for Appellee. ON BRIEF: Patricia McHugh Lambert, Smith, Somerville & Case, Baltimore, Maryland; Nathan J. Greenbaum, General Counsel, Joel A. Kramer, Associate Counsel, Washington Suburban Sanitary Commission, Laurel, Maryland, for Appellant. Joel A. Fischman, Angus E. Crane, Dickstein, Shapiro & Morin, L.L.P., Washington, DC, for Appellee.
 Before MURNAGHAN and NIEMEYER, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 Affirmed by published opinion. Judge MURNAGHAN wrote the opinion, in which Judge NIEMEYER and Senior Judge BUTZNER joined.
 OPINION
 MURNAGHAN, Circuit Judge:
 
 
 1
 Defendant-appellant Washington Suburban Sanitary Commission ("WSSC") operates a sewer system for Montgomery County, Maryland and Prince George's County, Maryland. Plaintiff-appellee Westfarm Associates Limited Partnership ("Westfarm"), a developer of property, owns land adjacent to one of WSSC's sewers. The sewer carries wastes from, among other places, the International Fabricare Institute ("IFI"), a trade association of dry cleaners and co-defendant below. Westfarm discovered on its property a trace of a hazardous substance, tetrachloroethylene (also known as perchloroethylene, perc, or "PCE"), which, Westfarm concluded, was flowing from IFI through leaks in the sewer system and contaminating the Westfarm property.
 
 
 2
 Westfarm sued IFI and WSSC as joint co-defendants for, inter alia, costs of response under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA," popularly known as Superfund), 42 U.S.C. Sec. 9607(a), and economic damages under a common law theory of negligence. The district court granted summary judgment for Westfarm on the CERCLA liability claim, and a jury found for Westfarm on the common law negligence claim.
 
 
 3
 WSSC now appeals on a variety of grounds, including, most prominently, public policy arguments for exempting sewer operators from liability for damage caused by wastes dumped in the sewers by third parties. Finding no abuse of discretion or legal errors by the district court, and finding that this Court is not the appropriate forum for WSSC's public policy arguments, we affirm in all respects.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 4
 In 1991, Westfarm engaged in negotiations to sell a particular parcel of property to a buyer. Just prior to closing the sale, an environmental audit uncovered the presence of PCE in the groundwater beneath the parcel.[1] 1] PCE is a toxic organic solvent that is widely used in the dry cleaning business. As a result of the PCE contamination, the buyer terminated the contract to purchase the property. Further testing by Westfarm's environmental consultants traced the PCE to IFI, an adjacent landowner that had been conducting laboratory research with PCE to explore the efficacy of various dry cleaning techniques. On January 2, 1992, Westfarm filed suit against IFI. Westfarm has since cleaned up its property.
 
 
 5
 IFI and its predecessor had operated a commercial drycleaning facility at a site abutting Westfarm's parcel until 1974, at which time IFI began conducting research at the site. IFI's research department analyzed hundreds of PCE samples each year. At the conclusion of each analysis, the remnants of the samples were poured down a sink drain into the connected sewer line. Each test remnant typically included ten milliliters of PCE. From 1974 to early 1992, IFI annually disposed of at least three gallons of PCE into the sewer line in this manner. IFI also placed trash contaminated with PCE into a dumpster located on IFI's land.
 
 
 6
 Whenever IFI poured PCE down the drain, the PCE entered a sewer lateral connecting IFI's building with a main sewer line running along Tech Road (the "Tech Road sewer"), which is owned and operated by WSSC. Most of the sewer lateral is owned and operated by IFI, but WSSC owns and operates a part of the sewer lateral (the "sewerhouse connection") which extends from WSSC's Tech Road sewer to the IFI property line, and which contains a manhole through which the sewer lateral can be reached. The sewerhouse connection meets the terminal end of the Tech Road sewer, which runs beside the portion of Westfarm's property abutting Tech Road.
 
 
 7
 In July of 1992, environmental consultants conducted a joint groundwater survey and eliminated other surrounding landowners as a potential source of the PCE on Westfarm's property; groundwater in the area flows to the southeast, and whereas groundwater just north of the sewer lateral contained no PCE, groundwater to the southeast of the sewer lateral contained high concentrations of PCE. In August of 1992, Westfarm conducted a video camera inspection of IFI's sewer lateral. In order to do so, Westfarm served a subpoena upon WSSC to gain access to the sewer lateral through WSSC's sewerhouse connection, which cameras could enter through the manhole. That inspection revealed a number of flaws in IFI's sewer lateral. Water samples taken within WSSC's manhole contained PCE.
 
 
 8
 On November 16, 1992, IFI sought leave to file a third-party complaint against WSSC asserting both Maryland common law claims and federal statutory claims under CERCLA. WSSC was informed of IFI's motion by Westfarm's counsel on December 14, 1993 at IFI's deposition of one of WSSC's employees. The motion was granted on January 12, 1993, and WSSC became a party to the suit. Westfarm subsequently amended its complaint by adding WSSC as a direct defendant as well.
 
 
 9
 On April 9, 1993, a video camera inspection of WSSC's Tech Road Sewer was conducted, revealing numerous flaws along the length of the line, including open joints, improper alignment resulting in sags in the line and offset joints, cracks, broken pipes, improperly installed gaskets and improper manhole construction. Although IFI had stopped its practice of dumping PCE several months earlier, water and sediment samples taken within the Tech Road Sewer revealed elevated levels of PCE, including the highest level found in any sample at the site--110,000 parts per billion (ppb) PCE in the sediment at WSSC's manhole.[2] One of Westfarm's experts, George Frigon, opined that the Tech Road Sewer was neither built in a workmanlike manner nor properly repaired.
 
 
 10
 WSSC's Tech Road Sewer was constructed in 1968. In 1969, IFI's predecessor applied to WSSC to connect its facility to the sewer, indicating to WSSC that it intended to operate a drycleaning plant at the site. In mid-1974, IFI informed WSSC that it intended to operate a laboratory at the site. IFI wrote to WSSC describing, among other things, the quantities and types of chemicals that would be going down the drain at IFI's laboratory, including many hazardous substances, but not including PCE. WSSC received and approved both plumbing permit applications.
 
 
 11
 WSSC initiated a survey of its sewer system in 1977. The survey was intended to identify those portions of the lines within the system that exhibited excessive infiltration, i.e., leakage of groundwater or surface waters into the sewer system (which results in added costs of transporting and treating the extraneous flows). During the survey, the Tech Road sewer segment closest to IFI was identified as exhibiting excessive flow, and the final report from the survey indicated that ten internal grouting repairs were needed, and supposedly were made, in the segment. However, neither Westfarm's nor IFI's sewer experts found any evidence in their 1993 video inspection that such repairs had been made.
 
 
 12
 In 1977, the EPA issued a report to Congress detailing waste disposal practices (including sewers) and their effects on groundwater. The EPA stated that "[t]he major cause of ground-water contamination from sanitary sewer systems (if above the water table[3]) is through outflow leakage (exfiltration) from gravity sewers." Common factors causing such leakage include poor workmanship, cracked or defective pipe and poorly constructed manholes. In response, in 1978, Congress amended the Clean Water Act to regulate toxic pollutants (including PCE) discharged into sewer systems.
 
 
 13
 In 1979, WSSC hired environmental consultants to develop a pretreatment program to respond to the amendments to the Clean Water Act. In 1980, the consultants prepared a booklet containing guidelines for industrial users about the program. Toxic pollutants such as PCE were identified specifically as objects of the program. The booklet, along with a questionnaire demanding information about discharges to WSSC's sewer system, were designed to be sent to industrial users, such as IFI. WSSC's industry file on IFI, however, included no such questionnaire and no evidence that IFI had even received the booklet.
 
 
 14
 In 1981 and again in 1984, two industrial investigation reports on IFI were conducted by WSSC or its consultants. The reports noted that gallons of PCE were stored next to floor drains on the premises, that commercial size drycleaning machines were in use, and that IFI's labs were performing tests on solvents. Neither report listed PCE wastes as one of the types of waste being disposed down the sewer.
 
 
 15
 Prior to 1983, WSSC's regulations placed no clear limit on the concentrations of toxic organics like PCE that could be disposed into the sewer. In 1983, WSSC, for the first time, limited the total toxic organics ("TTOs") permitted to be discharged to the sewer system to 0.58 milligrams per liter (mg/l). In 1988, WSSC revised the regulations to correspond with new EPA standards, changing the concentration of TTOs which could be discharged to the sewer system to 2.13 mg/l, where it remained at the time of trial.[4] Dr. Leonard Breitstein, a senior engineer with Westfarm's environmental consultants, testified that from 1983 to 1989 IFI was not in compliance with the PCE concentration limits, but that IFI was in compliance from 1990 to 1991. Michael Armorer, manager of WSSC's Industrial Discharge Control Unit, stated that WSSC was aware that laboratories routinely dispose of small amounts of chemicals into the sewer system and that WSSC knew IFI was doing so as far back as June 1974.
 
 
 16
 While Westfarm and IFI were conducting the discovery which brought forth the foregoing evidence, WSSC, despite having been added as a party in January of 1993, conducted little, if any, discovery. On April 27, 1993, less than two weeks before the May 7 discovery cut-off date, WSSC moved for a continuance of the discovery cut-off, but withdrew the motion before the district court had ruled on it.
 
 
 17
 In July of 1993, Westfarm, WSSC, and IFI all moved for summary judgment. WSSC also moved to dismiss the complaint on the grounds that, inter alia, Westfarm had not given WSSC timely notice of the claims. The district court denied WSSC's motion to dismiss. On July 16, 1993, the district court granted Westfarm's motion for summary judgment against WSSC and IFI on its CERCLA claims. See Westfarm Assocs. Ltd. Partnership v. International Fabricare Inst., 846 F.Supp. 422 (D.Md.1993). WSSC filed a motion for reconsideration of the CERCLA judgment, which was denied. After a hearing in October of 1993, Westfarm was awarded $140,930 in recoverable response costs under CERCLA.
 
 
 18
 The common law causes of action against IFI and WSSC were tried before a jury beginning on July 19, 1993. Prior to trial, the district court granted WSSC's motion in limine to prevent the admission of evidence or argument that WSSC had a duty to enact or enforce regulations which would have prevented IFI from putting PCE in the sewer system. WSSC moved for a directed verdict after the close of Westfarm's case, on the grounds that, inter alia, Westfarm had failed to produce sufficient expert testimony of the standards of care owed by sewer operators. The district court denied the motion. On July 30, 1993, the jury returned a verdict against WSSC for negligence, in favor of WSSC for nuisance and trespass, and against IFI for negligence, nuisance, trespass and strict liability. The jury awarded damages on the common law claims to Westfarm against IFI and WSSC, jointly and severally, in the amount of $2.5 million. Judgment was entered accordingly on August 4, 1993.
 
 
 19
 On August 5, 1993, WSSC moved to reduce the amount of the jury's judgment based on a Maryland statutory cap on the liability of certain governmental entities. The district court denied the motion. Westfarm Assocs. Ltd. Partnership v. International Fabricare Inst., 846 F.Supp. 439, 441 (D.Md.1993).
 
 
 20
 WSSC now appeals.
 
 II. DISCUSSION
 A.
 Notice:
 
 21
 WSSC is an agency of the State of Maryland. Md.Ann.Code art. 29, Sec. 1-101 et seq.; Katz v. Washington Suburban Sanitary Comm'n, 284 Md. 503, 397 A.2d 1027, 1031 (1979). For purposes of Maryland's Local Government Tort Claims Act ("LGTCA"), however, WSSC is treated as a local government, and is therefore subject to the provisions of the LGTCA. Md.Cts. & Jud.Proc.Code Ann. Sec. 5-401(d)(7).
 
 
 22
 The LGTCA generally requires that plaintiffs give local governmental defendants notice of any action for unliquidated damages within 180 days of the claim's accrual. Id. Sec. 5-404(a). An exception in the statute provides that "unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and for good cause shown the court may entertain the suit even though the required notice was not given." Id. at Sec. 5-404(c). In the instant case, Westfarm did not give notice to WSSC within 180 days, but the district court waived the LGTCA notice requirement on the grounds that Westfarm had shown good cause for the delay and WSSC had not shown prejudice from the delay. WSSC now challenges the district court's waiver, which we review for abuse of discretion, see Madore v. Baltimore County, 34 Md.App. 340, 367 A.2d 54, 57-58 (1976).
 
 
 23
 The test for showing "good cause" for the purposes of an LGTCA notice waiver is " 'whether the claimant prosecuted his claim with that degree of diligence that an ordinarily prudent person would have exercised under the same or similar circumstances.' " Madore, 367 A.2d at 57 (quoting Lee v. Houston Fire & Casualty Ins. Co., 530 S.W.2d 294, 296 (1975)). In the instant case, the circumstances involved environmental contamination, the source and causation of which typically require lengthy investigation for even an extraordinarily diligent person to discern. Cf. Lamb v. Global Landfill Reclaiming, 111 N.J. 134, 543 A.2d 443, 451-52 (1988) (holding that courts should take into account particular difficulties of proof inherent in environmental pollution claims when waiving the analogous notice provision of New Jersey law). Westfarm promptly investigated the source of PCE as soon as PCE was discovered on its property. Once IFI was identified as a source, Westfarm immediately instituted suit against IFI. In the course of further investigation, Westfarm put WSSC on notice of the contamination by requesting extensive discovery, including a video camera inspection of WSSC's sewers in August of 1992. In November 1992, IFI instituted suit against WSSC, and Westfarm amended its complaint to add WSSC as a defendant in early 1993. Under these circumstances, it was not an abuse of discretion for the district court to have found that Westfarm exercised reasonable diligence, and thus had shown "good cause" for waiving the LGTCA notice requirement.
 
 
 24
 WSSC claims that it was prejudiced by the failure to comply with the 180-day notice requirement. According to WSSC, Westfarm conducted key depositions before WSSC was on notice of suit, and WSSC would have been able to protect its interests if it had received notice of the depositions. WSSC, however, has not pointed to anything it would have done at these depositions which could have "protected its interests." Moreover, circumstantial evidence indicates that WSSC would have done nothing; WSSC did not engage in discovery until months after it became party to the suit, and although WSSC moved to continue the discovery cut-off, it withdrew the motion prior to obtaining a ruling by the district court. In light of those facts, WSSC has failed to show prejudice. Under the circumstances, the district court did not abuse its discretion in waiving the notice requirement.
 
 B. CERCLA:
 
 25
 Congress enacted CERCLA to protect public health and the environment from inactive hazardous waste sites. H.R.Rep. No. 1016(I), 96th Cong., 2d Sess. 1 (1980), reprinted in 1980 U.S.C.C.A.N. 6119, 6119. CERCLA is a comprehensive remedial statutory scheme, and as such, the courts must construe its provisions liberally to avoid frustrating the legislature's purpose. E.g., United States v. Carolina Transformer Co., 978 F.2d 832, 838 (4th Cir.1992); Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir.1986). CERCLA encourages private individuals to clean up environmental hazards by permitting them to recover specified costs of cleanup from parties defined by CERCLA to be responsible for the hazards. E.g., Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 841 (4th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992). Potentially responsible parties under CERCLA are strictly liable for cleanup costs, e.g., United States v. Monsanto Co., 858 F.2d 160, 167 & n. 11 (4th Cir.1988) ("[T]he overwhelming body of precedent ... has interpreted [CERCLA] as establishing a strict liability scheme."), cert. denied, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989), subject only to the statute's narrow defenses for damages caused solely by acts of God, war, or third parties. 42 U.S.C. Sec. 9607(a), (b).
 
 
 26
 In order to recover the costs of cleanup under CERCLA, a plaintiff must show (1) that the defendant "owned or operated" a "facility" from which there was a "release" or "threatened release" of a hazardous substance, (2) that the defendant is a "potentially responsible person," and (3) that the plaintiff incurred necessary cleanup costs "consistent with the national contingency plan." 42 U.S.C. Secs. 9601(9), 9601(20), 9601(22), 9605, 9607(a); see generally New York v. Shore Realty Corp., 759 F.2d 1032, 1039-42 (2d Cir.1985) (overview of CERCLA). Upon Westfarm's motion for summary judgment against WSSC on liability under CERCLA, the district court found that the undisputed facts established all of these elements.
 
 
 27
 In reviewing a grant of summary judgment, we must apply a de novo standard of review, drawing all reasonable inferences in favor of the nonmoving party. E.g., Carolina Transformer, 978 F.2d at 835. Summary judgment is proper when no genuine disputes of material fact remain, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). WSSC contends that summary judgment should have been granted for, rather than against, it on Westfarm's claim under CERCLA. WSSC argues that on the undisputed facts, it was not an operator of a "facility" and its actions did not constitute a "release." WSSC also argues that genuine disputes of material fact existed as to whether WSSC had caused a release, or was instead entitled to the third party "innocent landowner" defense.
 
 
 28
 1. Definition of "Facility" Under CERCLA.
 
 A "facility" is defined under CERCLA as:
 
 29
 (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works[5]), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.
 
 
 30
 42 U.S.C. Sec. 9601(9).
 
 
 31
 WSSC argues that the language of the statute evinces a Congressional intent to exclude "publicly owned treatment works," or POTWs, such as WSSC's sewer, from the definition of "facility." WSSC notes that to conclude that a POTW is a "facility" would be to render the parenthetical language above, "including any pipe into a sewer or publicly owned treatment works" surplusage, contrary to traditional rules of statutory interpretation. See, e.g., Ratzlaf v. United States, --- U.S. ----, ----, 114 S.Ct. 655, 659, 126 L.Ed.2d 615 (1994) (cautioning that courts should hesitate to interpret statutes in ways that make some of their language mere surplusage). Looking only to the subpart of the statute quoted above, WSSC is correct that to read the statute to include POTWs renders the parenthetical language surplusage; if POTWs are included in the definition of "facility," the words "pipe or pipeline" with no further explanation would suffice.
 
 
 32
 Reading CERCLA as a whole, however, as we must when interpreting a statute, see, e.g., United States v. Thompson/Center Arms Co., 504 U.S. 505, 512 n. 5, 112 S.Ct. 2102, 2107 n. 5, 119 L.Ed.2d 308 (1992) ("normal canons of construction caution [courts] to read the statute as a whole"), leads to the inescapable conclusion that Congress did not intend to exclude POTWs from liability. Congress expressly abrogated state sovereign immunity under CERCLA, see Pennsylvania v. Union Gas Co., 491 U.S. 1, 8, 109 S.Ct. 2273, 2278, 105 L.Ed.2d 1 (1989) ("Congress intended that States be liable along with everyone else for cleanup costs recoverable under CERCLA."), thereby subjecting "facilities" owned and operated by state governments to liability. A narrow exception to the definition of "owner or operator," however, was carved to exclude state and local governments from liability when they have acquired ownership of a facility "involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title." 42 U.S.C. Sec. 9601(20)(D). The traditional maxim of statutory interpretation that "the inclusion of one is the exclusion of the other," Glickstein v. United States, 222 U.S. 139, 143, 32 S.Ct. 71, 73, 56 L.Ed. 128 (1911), reminds us that if Congress had intended to exclude state and local governments from liability in other situations--such as when they, through their POTWs, are otherwise liable under CERCLA--Congress would have either: (a) excluded all state and local governments from the definition of "owner or operator," rather than limiting the exclusion to the involuntary acquisition situation; or (b) included POTWs in the list of entities excluded from the definition of "owner or operator." Cf. Key Tronic Corp. v. United States, --- U.S. ----, ----, 114 S.Ct. 1960, 1967, 128 L.Ed.2d 797 (1994) (Congressional inclusion of provisions for fee awards in some situations under CERCLA strongly suggests a deliberate decision not to award fees in other situations). In the context of the entire statute, it appears that Congress added the language, "including any pipe into a sewer or publicly owned treatment works," to emphasize the point that pipes leading into sewers or POTWs are the responsibility of the owner or operator of the pipes, not the sewer or POTW. See United States v. Powell, 379 U.S. 48, 56, 85 S.Ct. 248, 254, 13 L.Ed.2d 112 ("Our reading of the statute is said to render [one clause] surplusage to a large extent, for, as interpreted, the clause adds little.... [B]ut we think its primary purpose was no more than to emphasize [a point].").
 
 
 33
 WSSC also argues that the fact that the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA") permit certain levels of hazardous materials, including PCE, to be discharged into sewer systems, demonstrates that Congress could not have intended then to make sewer systems operators liable for the foreseeable sewer leaking of the PCE which was permitted to be in the pipes in the first place. WSSC fails to recognize, however, that Congress is unlikely to have assumed that sewer systems would keep their pipes in poor repair, thus drastically increasing the possibility that chemicals which travel through the pipes would leak into the environment. Moreover, WSSC's argument fails to take account of the different purposes served by CWA and RCRA on the one hand, and CERCLA on the other. As explained by the Second Circuit, in rejecting a similar argument:
 
 
 34
 RCRA is preventative; CERCLA is curative. It does not follow that because the environmental risk posed by household waste is deemed insufficient to justify the most stringent regulations governing its day-to-day handling that the environmental harm caused when that risk is realized is insufficient to require holding liable those responsible for that harm.... Even total compliance with [RCRA] regulations will not prevent releases or avoid CERCLA liability.
 
 
 35
 B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1202-03 (2d Cir.1992).[6] Congress's remedial purposes in enacting CERCLA are best served by including POTWs within the term "facilities," irrespective of the prospective regulations in CWA and RCRA.
 
 
 36
 Finally, WSSC warns us that we should not interpret "facilities" to include POTWs because to require state and local governments to pay for the cleanup of wastes dumped by others into sewers would be unfair--because taxpayers generally will foot the bill for the polluters--and unwise--because polluters will not internalize their own externalities. From a fairness perspective, WSSC's argument may appear meritorious. To make taxpayers, including taxpayers who do not use dry cleaners, pay for remedying damage caused by dry cleaning seems unfair--the people who used dry cleaners and the dry cleaning companies were the only ones who benefitted from the dry cleaning prices which, when IFI was dumping PCE in the sewer, were presumably lower than the dry cleaning prices would have been if IFI had been paying to dispose of PCE properly. From an economic efficiency perspective, WSSC may also have a strong argument. When industries pay for all costs, including any environmental cost, incurred in producing goods and services, the prices of those goods and services will reflect the real costs, and welfare-maximizing consumers will steer the economy in the most efficient direction. For example, if dry cleaning prices, once the cost of disposing of wastes safely was internalized, were $25 per shirt rather than $2 per shirt, people probably would start wearing more shirts which could be washed in the washing machine, and utility would be maximized.
 
 
 37
 However, contrary public policy arguments come to mind quickly. First, in light of the fact that many small business polluters are no longer in business or have pockets too shallow to pay for costs of environmental cleanup, all taxpayers, who are all hurt by pollution, benefit from paying for the cleanup rather than facing no cleanup at all. Cf. Shore Realty, 759 F.2d at 1045 ("Congress had well in mind that persons who dump or store hazardous waste sometimes cannot be located or may be deceased or judgment-proof."). Second, all taxpayers benefitted from lower tax rates during the period when WSSC failed to spend funds needed to mend leaks in the sewer pipes. Finally, although Congress can regulate pollution so as to internalize environmental costs in the future, Congress cannot turn back the clock and truly internalize the costs of past pollution because the people who bought dry cleaning at the former, artificially low prices are not necessarily the same people who would buy dry cleaning at the artificially high prices which would occur if the dry cleaner were now forced to pay all of the costs of past pollution. The infeasibility of perfectly internalizing past costs compared to the potentially perfect ability to internalize future costs may explain why Congress limited the liability of POTWs under RCRA and CWA, both forward-looking statutes, yet did not exempt POTWs from liability under CERCLA, a remedial statute. See Goodrich, 958 F.2d at 1202.
 
 
 38
 We sit as a court, not a super-legislature. While the public policy arguments raised by WSSC may be meritorious, we can only presume that those arguments were weighed and rejected by Congress when it enacted CERCLA without including a broad exemption for state and local governments or their POTWs. Therefore, we affirm the district court's finding that WSSC's sewer pipes are a "facility" under CERCLA.
 
 
 39
 2. Definition of "Release" Under CERCLA.
 
 
 40
 According to WSSC, the movement of PCE through cracks in WSSC's sewer onto Westfarm's land should not be considered a "release" under CERCLA. We, like the district court, reject WSSC's contention.
 
 A "release" is defined under CERCLA as:
 
 41
 any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment....
 
 
 42
 42 U.S.C. Sec. 9601(22). The Fourth Circuit has interpreted the words "leaking" and "spilling" in CERCLA's parallel, extremely broad definition of "disposal" to include passive conduct. See Nurad, 966 F.2d at 845. For example, if tanks which have been placed on a defendant's land by a previous owner leak contaminants, the subsequent owners, who did not place the tanks or their contents on the land, potentially are liable as owners or operators at the time of a "disposal." See id. at 845. The plain meaning of the statute supports the Nurad reading; "leaking," "leaching," and "escaping" are all words which imply passive conduct.
 
 
 43
 WSSC urges us to distinguish Nurad on its facts, arguing that Nurad involved subsequent owners of facilities which released hazardous material, but did not address the question of migrating releases which travel through various properties. WSSC claims that to find that the leaking from WSSC's sewers was a release would lead to the "unfair" result that Westfarm would be liable if contaminants leaked onto its land and then flowed onto another's land. However, we see no reason to limit the holding in Nurad to those "multiple releases"--i.e., releases from a defendant's property where the defendant was not the first person to release the hazardous material, but is releasing a hazardous material which previously has been released by another--which are non-migrating. CERCLA is designed to insure cleanup of the environment, and our inclusion of "multiple releases"--whether separated in time or in space--within the definition of "release" best effectuates CERCLA's remedial goals. Our sister circuits which have considered the question agree that CERCLA imposes liability for multiple releases. See, e.g., Dedham Water, 889 F.2d at 1151 (1st Cir.); Tanglewood East Homeowners v. Charles-Thomas, Inc., 849 F.2d 1568, 1573 (5th Cir.1988) (refusing to limit "disposal" to a one-time occurrence because "there may be other disposals when hazardous materials are moved, dispersed, or released...."); Shore Realty, 759 F.2d at 1045 (2d Cir.); see also Lincoln Properties Ltd. v. Higgins, 823 F.Supp. 1528, 1536-39 (E.D.Cal.1992). But see, e.g., Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp., 976 F.2d 1338, 1342 n. 7 (9th Cir.1992) (declining to reach issue of whether a passive second releaser in a multiple release scenario may be held liable).
 
 
 44
 Moreover, we may speculate that Westfarm cleaned up the PCE on its property in part because of fear of future CERCLA liability if the PCE on its land one day were to flow onto another's land. As we explained in Nurad, "[a] CERCLA scheme which rewards indifference to environmental hazards and discourages voluntary efforts at waste cleanup cannot be what Congress had in mind." Nurad, 966 F.2d at 845-46. Although the simplistic slogan, "make the polluter pay," may have helped propel CERCLA into law, see, e.g., Long Beach Unified Sch. Dist. v. Dorothy B. Godwin Living Trust, 32 F.3d 1364, 1369 (9th Cir.1994), the statutory scheme does not take a simplistic view of who is and is not a "polluter." In the instant case, WSSC's failure to maintain its pipes in good condition earned it some responsibility for the contamination, and therefore we find no inconsistency between the notion that CERCLA "imposes the costs of cleanup on those responsible for the contamination," Union Gas, 491 U.S. at 7, 109 S.Ct. at 2277, and the notion that the leaking of PCE from WSSC's sewers constituted a release. Therefore, the district court did not err in holding that the PCE leaking from WSSC's sewers was a release within the meaning of CERCLA.
 
 
 45
 3. Genuine Dispute of Material Fact as to Causation.
 
 
 46
 Contrary to the rule followed in most areas of the law, the burden of proof as to causation in a CERCLA case lies with the defendant. See, e.g., In re Bell Petroleum Servs. Inc., 3 F.3d 889, 893 n. 4 (5th Cir.1993) (citing cases); Monsanto, 858 F.2d at 170 & n. 17. The plaintiff must prove only that contaminants which were once in the custody of the defendant could have travelled onto the plaintiff's land, and that subsequent contaminants (chemically similar to the contaminants once existing in defendant's custody) on the plaintiff's land caused the plaintiff to incur cleanup costs. See Monsanto, 858 F.2d at 169. Cf. White v. County of Newberry, South Carolina, 985 F.2d 168, 174 (4th Cir.1993) (finding that because plaintiffs had not shown that contaminants were ever located on defendant County's land, grant of summary judgment in favor of County on CERCLA claim was proper). The plaintiff need not produce any evidence that the contaminants did flow onto its land from the defendant's land. Rather, once plaintiff has proven a prima facie case, the burden of proof falls on the defendant to disprove causation.
 
 
 47
 Congress adopted this unique allocation of the burdens of proof after specifically rejecting a version which would have required the plaintiff to prove causation. See Monsanto, 858 F.2d at 170 n. 17. As we have explained elsewhere:
 
 
 48
 In deleting causation language from section 107(a) [of CERCLA], we assume as have many other courts, that Congress knew of the synergistic and migratory capacities of leaking chemical waste, and the technological infeasibility of tracing improperly disposed waste to its source.
 
 
 49
 Id. at 170. Because the defendant bears the burden of proof as to causation, a defendant, to survive summary judgment, must come forward with sufficient evidence from which a jury could find that the defendant was not the source of the contamination.
 
 
 50
 WSSC asserts that it met that burden by producing the following evidence: (1) an affidavit of an expert, Dr. Ram, stating that "[c]urrent evidence does not substantiate the WSSC sewer as a source of PCE contamination to the underlying aquifer."[7] ; (2) "WSSC's ability to produce evidence that the sewer did not leak." The second contention is false; WSSC never produced any evidence that the sewer did not leak, and, on the contrary, Westfarm produced abundant evidence that the sewer did leak. The first piece of evidence, too, did not serve to meet WSSC's burden because Dr. Ram's statement does not indicate that WSSC could disprove causation--only that the evidence did not prove causation. Because the burden lay on WSSC to disprove that it was a source of PCE, the fact that the evidence on summary judgment produced a genuine dispute as to whether the evidence proved WSSC to be a source was not material, and could not serve as a basis to deny summary judgment to Westfarm. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (holding summary judgment is proper against nonmoving party who fails to produce evidence "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").
 
 
 51
 A similar situation existed in Artesian Water Co. v. New Castle County, 659 F.Supp. 1269 (D.Del.1987), aff'd 851 F.2d 643 (3d Cir.1988). In that case, summary judgment was granted despite the defendant's submission of an expert affidavit opining that the toxic wastes at issue could not be shown, with "any reasonable degree of probability," to have emanated from defendant's site. Id. at 1281. The fact that the evidence did not prove causation, did not create a genuine dispute as to whether the defendants could state with any reasonable degree of probability that the toxic wastes did not emanate from defendant's site. Id. at 1282. As in Artesian Water, summary judgment was appropriate here, because the defendant did not produce a genuine dispute of material fact as to noncausation.[8]
 
 
 52
 4. Innocent Landowner Defense Under CERCLA.
 
 
 53
 CERCLA provides "a limited affirmative defense based on the complete absence of causation," Monsanto, 858 F.2d at 168, known as the "innocent landowner defense." The elements of this "third party defense" are the following, each of which must be proven by the defendant by a preponderance of the evidence: (1) that another party was the "sole cause" of the release of hazardous substances and the damages caused thereby; (2) that the other, responsible party did not cause the release in connection with a contractual, employment, or agency relationship with the defendant; and (3) that the defendant exercised due care and guarded against the foreseeable acts or omissions of the responsible party. 42 U.S.C. Sec. 9607(b)(3). We find that WSSC failed to produce sufficient evidence of the "due care" element of the defense.[9]
 
 
 54
 The "due care" element of the third party defense requires the defendant to prove that it "exercised due care with respect to the hazardous substance concerned," and that it "took precautions against foreseeable acts or omissions of any ... third party." Id. WSSC claims that it presented sufficient evidence from which a reasonable jury could find that it exercised due care and took precautions against foreseeable acts of IFI. WSSC claims that IFI's acts of dumping PCE into the sewers were unforeseeable, and therefore due care did not require WSSC to take any precautions.
 
 
 55
 As we previously have explained in connection with a landowner's claim that a tenant's waste disposal was unforeseeable, CERCLA does not sanction "willful or negligent blindness." Monsanto, 858 F.2d at 169; see also Shore Realty, 759 F.2d at 1049 (finding that defendant landowner who was aware of the nature of tenants' activities could have foreseen dumping of hazardous waste). The undisputed evidence at summary judgment indicated that WSSC knew from inspecting IFI's facility that IFI used PCE and knew that IFI poured hazardous substances into the sewer. In fact, WSSC regulations permitted discharges of certain quantities of toxic organics and other hazardous substances. WSSC was also aware that cracks were present in its sewer. Yet WSSC took no precautions--such as mending the pipes or banning the discharge of toxic organics--against the foreseeable result that hazardous substances such as PCE would be discharged into the sewer. Cf. Lincoln Properties, 823 F.Supp. at 1542-43 (holding County sewer authority entitled to assert innocent landowner defense where the County "took reasonable precautions to prevent releases of hazardous substances" and "no evidence [existed] that the County could or should have foreseen the releases."). WSSC had the power to abate the foreseeable release of PCE, yet failed to exercise that power. In light of such failure, we cannot find that any genuine dispute was created that WSSC exercised due care or took precautions against the foreseeable acts of third parties such as would have entitled it to the "innocent landowner" defense. Cf. Nurad, 966 F.2d at 842 (in interpreting definition of "operator," declining "to absolve from CERCLA liability a party who possessed the authority to abate the damage caused by the disposal of hazardous substances but who declined to actually exercise that authority by undertaking efforts at a cleanup.").
 
 
 56
 Finally, WSSC's policy argument that CERCLA liability in the instant case will force sewer operators to fear liability from "every toilet, sink, shower and bath," falls flat. If domestic users of sewers do not foreseeably release hazardous materials into the sewer system, the third party defense will allow WSSC to avoid liability for an unforeseeable dumping of hazardous substances into domestic plumbing.
 
 
 57
 Because no genuine issue of material fact remained, the district court properly entered summary judgment for Westfarm on the CERCLA liability claim.
 
 C. Negligence:
 
 58
 Westfarm asserted negligence as a state law claim--under both diversity and pendent jurisdiction--against WSSC. Thus, Maryland law applies to the issues of duty and proximate cause raised on appeal. See Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Negligence under Maryland law consists of the familiar common law elements:
 
 
 59
 "First, the defendant must be under a duty to protect the plaintiff from injury. Second, the defendant must fail to discharge that duty. Third, the plaintiff must suffer actual loss or injury proximately resulting from that failure."
 
 
 60
 Hartford Insurance Co. v. Manor Inn of Bethesda, Inc., 335 Md. 135, 642 A.2d 219, 225 (1994) (quoting Lamb v. Hopkins, 303 Md. 236, 492 A.2d 1297, 1300 (1985)).
 
 
 61
 WSSC challenges the district court's holding that it had a duty to Westfarm, and the district court's finding that sufficient evidence of proximate cause had been produced to send the case to the jury. Thus, WSSC argues that it was entitled to a directed verdict on the negligence claim. We review a denial of a motion for a directed verdict de novo, employing the same standard used by the district court--whether viewing the evidence in the light most favorable to the opposing party, a reasonable jury could come to but one conclusion. See County of Newberry, 985 F.2d at 172-73; Gairola v. Virginia Dep't of General Servs., 753 F.2d 1281, 1285 (4th Cir.1985).
 
 
 62
 1. Duties of Sewer Operators.
 
 
 63
 WSSC asserts that, as a matter of law, a sewer operator has no duty to protect adjacent landowners from pollutants originating with other landowners, and that Westfarm was permitted to present inadmissible evidence to the jury on the duty issue. Westfarm replies that WSSC owed Westfarm a duty of reasonable care in the construction, maintenance, and operation of its sewer, and that its evidence regarding the duty was proper. A trial court's finding of a duty of reasonable care is a legal question reviewed de novo. See Eisel v. Board of Educ., 324 Md. 376, 597 A.2d 447, 452-56 (1991) (determining existence of a duty as a matter of law). A decision to admit evidence is reviewed for an abuse of discretion. See Hottle v. Beech Aircraft Corp., 47 F.3d 106, 111 (4th Cir.1995).
 
 
 64
 a. Public duty exception. WSSC, as a state agency, ordinarily would be entitled to sovereign immunity from any common law claims such as negligence. See Katz, 397 A.2d at 1032. In 1927, however, Maryland waived WSSC's sovereign immunity, Md.Code Ann. art. 29, Sec. 1-201, and Maryland courts have since held that WSSC can be sued, Katz, 397 A.2d at 1034. Specifically, WSSC can be sued for negligent construction, maintenance, and operation of its sewer systems, Katz 397 A.2d at 1028-29 (holding that plaintiffs could state claims against WSSC for negligence when WSSC's water main burst and caused flooding, and when rocks and debris in WSSC's fire hydrants caused fire hoses to become clogged), as can local governments operating sewer systems, e.g., True v. Mayor of Westernport, 196 Md. 280, 76 A.2d 135, 136 (1950) ("A municipality is liable not only for negligence in the construction of a sewer, but also for negligence in failing to keep it in proper repair.") (citation omitted). The rationale for permitting suits against sewer systems run by localities was based upon the governmental-proprietary function distinction in Maryland municipal government law, see Maryland-National Capital Park & Planning Comm'n v. Kranz, 308 Md. 618, 521 A.2d 729, 731 (1987) (explaining governmental-proprietary distinction); Birge v. Town of Easton, 274 Md. 635, 337 A.2d 435, 438 (1975) (holding that "a municipality which operates a utility acts in a business or proprietary, rather than a governmental capacity...."); Taylor v. Mayor of Baltimore, 130 Md. 133, 99 A. 900, 904-05 (1917) (holding that municipality, to same extent as a private entity, is not immune from suit for tortious construction or maintenance of sewers), a distinction which is not applicable to state agencies such as WSSC, see Maryland-National, 521 A.2d at 733; Prince George's County v. Blumberg, 44 Md.App. 79, 407 A.2d 1151, 1177 (1979) (Blumberg I ), rev'd on other grounds, 288 Md. 275, 418 A.2d 1155 (1980) (Blumberg II ) (reversing for failure to exhaust administrative remedies). The rationale for permitting suits against WSSC is that the Maryland legislature has expressly waived WSSC's sovereign immunity.
 
 
 65
 WSSC's waiver of sovereign immunity does not, however, subject it to suit for all of its actions. Rather, under the public duty doctrine, WSSC may not be held liable for negligent acts or omissions in the enactment or enforcement of regulations. But cf. Blumberg II, 418 A.2d at 1166-67 (administrative remedies may be pursued against WSSC on claims of wrongful issuance or revocation of permits). The public duty doctrine is based on the premise that
 
 
 66
 "Absent statutory intention to the contrary, the duty to enforce statutory law is a duty owed to the public generally, the breach of which is not actionable on behalf of the private person suffering damage."
 
 
 67
 Willow Tree Learning Ctr., Inc. v. Prince George's County, 85 Md.App. 508, 584 A.2d 157, 161 (1991) (quoting Duran v. City of Tucson, 20 Ariz.App. 22, 509 P.2d 1059, 1063 (1973)). WSSC argues that the "public duty doctrine" exempts it from liability to Westfarm for negligence.
 
 
 68
 WSSC had no common law duty to Westfarm to enact or enforce regulations which might have prevented IFI from putting PCE or other dangerous chemicals into the sewer. Cf. E. Eyring & Sons Co. v. City of Baltimore, 253 Md. 380, 252 A.2d 824, 825-26 (1969) (no common law duty to enact or enforce building codes to protect the personal or property interests of individuals). Similarly, WSSC's existing regulations did not " 'set forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole,' " and therefore did not create a statutory duty from WSSC to Westfarm. See Ashburn v. Anne Arundel County, 306 Md. 617, 510 A.2d 1078, 1087 (1986) (standard for finding duty created by statute) (citations omitted). However, where a governmental body's conduct is a common law tort, it cannot claim immunity from suit by relying on the fact that, simultaneously, it was failing to enforce the law. See Quelvog v. City of Long Beach, 6 Cal.App.3d 584, 86 Cal.Rptr. 127, 132 (1970). And the mere existence of a statute which relates to similar injuries but does not give rise to a statutory duty does not preclude the existence of a common law duty. Eisel, 597 A.2d at 454 (finding that existence of statute concerning student suicide did not give rise to a statutorily-based duty on the part of school counselors, but neither did the absence of a statutory duty preclude a common law duty). Thus, the public duty doctrine does not preclude the existence of a common law duty from WSSC to Westfarm to exercise due care in the construction, maintenance, and operation of the sewer.
 
 
 69
 The district court properly so held: The court appropriately directed Westfarm, on WSSC's pretrial motion in limine, not to argue that WSSC failed to enact or enforce regulations,[10] and properly instructed the jury that WSSC could be found negligent, not for a breach of its public duties of enacting and enforcing regulations, and not for a breach of any particular regulation, but rather for a breach of its common law duties "to construct the Tech Road sewer in a workmanlike manner and inspect, maintain, and properly operate that sewer."[11]
 
 
 70
 b. Admission of Evidence. WSSC argues that Westfarm was permitted to present evidence to the jury to substantiate a theory of negligence in enactment and enforcement of regulation, contrary to the public duty doctrine. WSSC points to evidence presented by Westfarm that WSSC took no action to require IFI to comply with WSSC's regulations, that WSSC failed to require IFI to obtain a discharge authorization permit, and that WSSC failed to monitor IFI's discharges to ensure that they were in compliance with the regulations.
 
 
 71
 However, the evidence pointed to by WSSC was all relevant and admissible to show foreseeability of the presence of contaminants in the sewer system, and such foreseeability relates to two elements of common law negligence: duty and proximate causation. Foreseeability of contaminants is necessary not to show that WSSC had a duty to exercise its power to enforce or enact regulations, but to show that WSSC's common law duty to exercise due care in the construction and maintenance of its sewer foreseeably would be breached by failure to take reasonable action in response to the contaminants. The fact that the foreseeability of the presence of contaminants was proven in part by WSSC's failure to enforce its own regulations does not allow WSSC to escape liability for negligence; as the Federal Rules of Evidence implicitly recognize, a piece of evidence may be admitted though it is inadmissible for one purpose, where it is admissible for another. See Fed.R.Evid. 105 ("When evidence which is admissible ... for one purpose but not admissible ... for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.").[12] The district court did not abuse its discretion in admitting the evidence.
 
 
 72
 c. Common Law Duty. Under Maryland law, the following factors must be considered in determining whether a tort duty should be recognized:
 
 
 73
 The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.
 
 
 74
 Eisel, 597 A.2d at 452 (citations and internal quotation marks omitted). WSSC argues that we should not recognize a duty from WSSC to Westfarm to construct, maintain, and operate sewers with due care, on the basis that two of the factors--foreseeability and the extent of the burden to the defendant--weigh against finding a duty.
 
 
 75
 Turning to the first, and most important element of the duty calculus under Maryland law, see Eisel, 597 A.2d at 452, foreseeability, we note that Maryland courts further the familiar social policy of limitation of liability for unforeseeable consequences which was announced in Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99 (1928): " 'The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension.' " Hartford Ins., 642 A.2d at 226 (quoting Palsgraf, 162 N.E. at 100). Maryland courts have long recognized that flooding damage is of a type of risk which sewer operators should reasonably perceive from negligently constructed, maintained, or operated pipes which leak or burst. See, e.g., Katz, 397 A.2d at 1028; True, 76 A.2d at 136. Thus the question we now must answer is whether the risk of PCE entering and injuring an adjacent landowner's land is of a type of risk which would reasonably have been foreseen at the time WSSC engaged in the allegedly negligent conduct of failing to construct, maintain, and operate its Tech Road sewer with due care. See Henley v. Prince George's County, 305 Md. 320, 503 A.2d 1333, 1341 (1986) (foreseeability factor requires "prospective consideration of the facts existing at the time of the negligent conduct.").
 
 
 76
 WSSC disavows liability for negligent construction of the sewer because in 1968, when the sewer was built, it was unforeseeable that Westfarm or other landowners would be hurt by WSSC's faulty construction-work. Of course, in 1968, it was unforeseeable that IFI would open a laboratory in 1974 and put PCE in the sewer, or that PCE would harm the land it entered.
 
 
 77
 However, Westfarm's claim was for negligent construction, maintenance, and operation of the sewer, not a discrete claim for negligent construction. Although WSSC may not have been negligent when the sewer was constructed originally, the construction of the sewer became negligent over time as it began to crack and the dangers of leaky sewers became known. WSSC knew from its 1977 sewer survey that the Tech Road sewer contained cracks requiring repair; a reasonable person would have perceived that cracks lead to leaks. WSSC was given notice of the dangers to groundwater from leaky sewers in 1979, when WSSC hired environmental consultants to help it respond to the Clean Water Act, which was passed, in part, to respond to the dangers of leaky sewers. WSSC's own employee, Michael Armorer, admitted that WSSC was aware as far back as 1974 that IFI disposed small amounts chemicals into the sewer. WSSC's own regulations permitted the discharge of toxic organics such as PCE in limited concentrations, and WSSC knew IFI used PCE. Even though IFI did not report discharges of PCE, WSSC permitted PCE discharges, WSSC knew IFI used PCE, and WSSC knew that no sampling had ever been performed to test whether IFI discharged PCE. Thus, WSSC should reasonably have perceived some risk that groundwater contaminants such as PCE were being released into the sewer.
 
 
 78
 Once WSSC knew or should have known of the leaks, the dangers to groundwater of toxic organics, and the risk that groundwater contaminants were being released, it reasonably should have perceived that its original construction of the sewer, and its subsequent failure to inspect and repair the sewer, could cause groundwater contamination to neighboring land. Because Westfarm was clearly within the class of landowners whose land foreseeably would have been harmed by WSSC's negligence, WSSC owed Westfarm a duty to reconstruct, maintain and operate the sewer in a manner reasonably calculated to avoid the harm.
 
 
 79
 Although WSSC claims that "every toilet, sink, shower and bath" will become a potential source of liability to WSSC--and thus that the extent of the burden to WSSC weighs against imposing a duty--we note that the scope of WSSC's duty is limited by ordinary principles of negligence. As Maryland courts have recognized, " '[a]s the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies,' " Hartford Ins., 642 A.2d at 226 (quoting West Virginia Cent. & Pittsburgh Ry. v. Fuller, 96 Md. 652, 54 A. 669, 671 (1903)), and a governmental entity "does not insure its citizens against damage from works of its construction, and is only liable as other proprietors for negligence or willful misconduct," Hanrahan v. Mayor of Baltimore, 114 Md. 517, 80 A. 312, 318 (1911). WSSC argues that because Westfarm admitted that all sewers leak--because water can pass through a solid wall of concrete to a small extent--all sewer operators will be held liable. The duty to exercise reasonable care, however, does not require a leakproof sewer system, only a sewer which does not leak unreasonably due to being constructed, maintained, and operated without due care. Moreover, the scope of the duty reasonably to prevent leaks will vary with the reasonable expectation of what materials foreseeably might find their way into the sewer; the reasonable construction, maintenance, and repair of a sewer carrying only "toilet, sink, shower and bath" household waste might differ from the reasonable construction, maintenance, and repair of a sewer carrying dangerous industrial chemicals.[13]
 
 
 80
 2. Sufficiency of Evidence of Proximate Cause.
 
 
 81
 To be held liable for negligence, the defendant's breach of duty must have been the proximate cause of the alleged injury. As Maryland courts have explained:
 
 
 82
 Proximate cause ultimately involves a conclusion that someone will be held legally responsible for the consequences of an act or omission. This determination is subject to considerations of fairness or social policy as well as mere causation. Thus, although an injury might not have occurred "but for" an antecedent act of the defendant, liability may not be imposed if for example the negligence of one person is merely passive and potential, while the negligence of another is the moving and effective cause of the injury ... or if the injury is so remote in time and space from defendant's original negligence and another's negligence intervenes.
 
 
 83
 Peterson v. Underwood, 258 Md. 9, 264 A.2d 851, 855 (1970) (citations omitted).
 
 
 84
 Proximate cause will not be found when a third party's negligent conduct is an independent intervening cause of the injury. Hartford Ins., 642 A.2d at 229. Yet two defendants may be found jointly liable if each is a proximate cause of the injury. E.g., Atlantic Mut. Ins. Co. v. Kenney, 323 Md. 116, 591 A.2d 507, 513 (1991); cf. True, 76 A.2d at 136 ("The fact that a property owner's land is flooded because of an extraordinary rainfall does not relieve the municipality from liability, where such rainfall would not have caused the damage in the absence of the clogging up or stoppage of the sewer, caused by the negligence of that municipality.") (citations omitted). The key to determining whether a third party's negligent conduct is a supervening cause or merely a contributing cause is foreseeability:
 
 
 85
 [T]he liability of the person first in fault will depend upon the question whether the negligent act of the other was one which a man of ordinary experience and sagacity, acquainted with all the circumstances, could reasonably anticipate or not.
 
 
 86
 Atlantic Mut., 591 A.2d at 514 (quoting State v. Hecht Co., 165 Md. 415, 169 A. 311, 313 (1933)). Proximate cause may be found even where the conduct of the third party is tortious or criminal, so long as the conduct was facilitated by the first party and reasonably foreseeable, and some ultimate harm was reasonably foreseeable. Scott v. Watson, 278 Md. 160, 359 A.2d 548, 556 (1976).
 
 
 87
 WSSC contends that insufficient evidence was presented to find that it was the proximate cause of Westfarm's injury; indeed, it contends that IFI was an independent intervening superseding cause. WSSC contends that its actions were too passive and remote to be deemed a proximate cause, because IFI's placement of PCE in the sewer system, which at times exceeded the concentration levels of WSSC's regulations, was unforeseeable to WSSC.
 
 
 88
 Viewing the evidence in the light most favorable to the nonmovant, however, sufficient evidence existed for a reasonable jury to determine, as it did, that WSSC's negligence was a proximate cause of Westfarm's injury. Although once WSSC built its sewer system, it apparently did become quite "passive" in its actions regarding operation and maintenance of the sewer, this passivity was negligent in and of itself because WSSC knew that the sewer contained cracks and should have known that the sewer needed maintenance. WSSC knew that IFI used PCE, knew that IFI discharged other hazardous chemicals, and knew that IFI's waste stream had never been monitored for TTOs. WSSC's regulations permitted the discharge of certain concentrations of PCEs such as TTOs.
 
 
 89
 Under the test for foreseeability established by the Maryland Court of Appeals, "looking back from the harm to the actor's negligent conduct [to determine whether] it appears to the court highly extraordinary that [the conduct] should have brought about the harm," Stone v. Chicago Title Ins. Co., 330 Md. 329, 624 A.2d 496, 500 (1993) (citation omitted), it does not seem "extraordinary" that the sewer would carry PCE and leak PCE into the groundwater and then into the adjoining land of Westfarm. A reasonable jury could have found, as it did, for the nonmovant, and therefore the district court's denial of WSSC's motion for a directed verdict was proper.
 
 
 90
 D. Raising of Statutory Damage Cap Post-Judgment:
 
 
 91
 Judgment was entered on the jury's verdict on August 4, 1993. On August 5, WSSC moved to amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure to reduce its liability on the negligence judgment to $200,000 based upon the following provision in the Maryland LGTCA:
 
 
 92
 The liability of a local government may not exceed $200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions....
 
 
 93
 Md.Cts. & Jud.Proc.Code Ann. Sec. 5-403(a). The liability cap was enacted on July 1, 1987, and is applicable prospectively only. Surratt v. Prince George's County, 320 Md. 439, 578 A.2d 745, 751 n. 5 (1990). As noted supra, although WSSC is a state agency, it is treated as a local government for purposes of the LGTCA, and therefore is entitled to the benefit of LGTCA provisions.
 
 
 94
 WSSC had never directly raised the cap as an issue prior to the entry of judgment. WSSC claims that it indirectly raised the statutory cap by pleading governmental immunity and by raising the notice provisions of the LGTCA. WSSC also claims that Westfarm knew about the cap, and therefore has shown no prejudice from any failure of WSSC to raise the cap prior to trial. We, like the district court, disagree: Raising the LGTCA's notice requirement does not effectively raise the issue of the LGTCA's damages cap; the two provisions of the LGTCA are different defenses. Compare Md.Cts. & Jud.Proc.Code Ann. Sec. 5-403(a) with id. Sec. 5-404(a). And while it is true that prior to WSSC's entry into this suit Westfarm indicated, in a motion opposing the addition of WSSC as a party, an awareness of the statutory cap, this awareness of the law did not put Westfarm on notice that WSSC would ever raise the defense.
 
 
 95
 More substantially, WSSC argues that the cap is a recapture of sovereign immunity, which is not waivable under Maryland law. As the Maryland Court of Appeals has explained, under Maryland law
 
 
 96
 [i]t is of no moment that the matter of sovereign immunity was not raised below by the pleadings or otherwise.... "[T]he law is well established that counsel for the State or one of its agencies may not either by affirmative action or by failure to plead the defense, waive the defense of governmental immunity in the absence of express statutory authorization, or by necessary implication from a statute."
 
 
 97
 Board of Trustees of Howard Community College v. John K. Ruff, Inc., 278 Md. 580, 366 A.2d 360, 362 (1976) (quoting Board of Educ. v. Alcrymat Corp., 258 Md. 508, 266 A.2d 349, 353 (1970)). WSSC therefore asserts that any failure of WSSC to raise the cap prior to entry of judgment does not waive the cap.
 
 
 98
 The district court found that the cap is an affirmative defense, which therefore must be raised, according to Federal Rule of Civil Procedure 8(c), in the defendant's answer, unless the record indicates that the defense has been introduced without objection and tried by the "express or implied consent" of the parties, see Fed.R.Civ.P. 15(b). The district court found that because the defense had not been raised or tried by the parties, it was waived.
 
 
 99
 We review a district court's factual findings on a Rule 59(e) motion for abuse of discretion, Simon v. United States, 891 F.2d 1154, 1159 (5th Cir.1990), but we review the district court's legal holdings de novo, Taylor v. United States, 821 F.2d 1428, 1430 n. 1 (9th Cir.1987) (Taylor I ), cert. denied, 485 U.S. 992, 108 S.Ct. 1300, 99 L.Ed.2d 510 (1988) (White, J., dissenting from denial of certiorari) (Taylor II ).
 
 
 100
 We first note that our sister circuits are split as to whether state or federal law controls the characterization of a state statutory liability cap when raised in federal court in connection with a state law claim. Further, the circuits which hold that federal law governs, are split as to how federal law characterizes a cap. As explained by Justice White in his dissent from the denial of certiorari in Taylor v. United States:
 
 
 101
 Under the accepted interpretation of Rule 8(c) of the Federal Rules of Civil Procedure, any matter "constituting an avoidance or affirmative defense" to the matters raised in the plaintiff's complaint must be pleaded in a timely manner or it is deemed to be waived. As a matter of California law, the state statute at issue in this case is understood to be an affirmative defense. The Ninth Circuit held, however, that this determination is not binding on a federal court because the proper characterization of the statute in this case, which was brought in federal court, is a matter of federal procedural law. The court ruled that this statute is a mere limitation of liability, rather than an avoidance or an affirmative defense. This conclusion conflicts with the decisions of two other Courts of Appeals. In Ingraham v. United States, 808 F.2d 1075, 1078-1079 (1987), the Fifth Circuit held that an identical statutory limitation on damages recoverable in the State of Texas is an affirmative defense that is waived under the Federal Rules by failure to plead it in a timely manner. And in Jakobsen v. Massachusetts Port Authority, 520 F.2d 810, 813 (1975), the First Circuit held that a statutory limitation on liability is an affirmative defense under Rule 8(c).
 
 
 102
 Taylor II, 485 U.S. at 992-93, 108 S.Ct. at 1301 (White, J., dissenting from denial of certiorari). More recently, the Tenth Circuit considered the issue of whether a state statutory cap on the liability of local governments could be raised in a post-trial motion. Bentley v. Cleveland County Bd. of County Comm'rs, 41 F.3d 600, 604-05 (10th Cir.1994). Without analyzing how the cap is treated under state law, the Tenth Circuit held that the cap was a waivable limit on liability rather than sovereign immunity. Id. at 604. The Tenth Circuit held further that even if the cap were sovereign immunity, sovereign immunity is waived when not raised, as a matter of federal law. Id. at 604-05.
 
 
 103
 Thus we are presented with two questions undecided in the Fourth Circuit: (a) whether state or federal law governs the characterization of the cap; (b) if federal law governs, whether it characterizes the cap as (i) an affirmative defense, which is waived by a failure to raise it at a "pragmatically sufficient time," Lucas v. United States, 807 F.2d 414, 418 (5th Cir.1986), (ii) sovereign immunity, which is waived by the failure to raise it, see Bentley, 41 F.3d at 604-05, or (iii) a limitation of liability, which is not waived by a failure to raise it, see Taylor I, 821 F.2d at 1433. Moreover, if we find that Maryland state law governs, we are led to a question undecided as a matter of Maryland state law: whether the cap is an affirmative defense, which is waived by a failure to raise it, or a recapture of sovereign immunity, which is not waived by a failure to raise it.
 
 
 104
 We need not decide these thorny and undecided issues of federal and Maryland law, however, because a review of the record indicates that any error in failing to permit WSSC to raise the cap postjudgment was harmless. See Fed.R.Civ.P. 61; O'Neal v. McAninch, --- U.S. ----, ----, 115 S.Ct. 992, 997, 130 L.Ed.2d 947 (1995). Whether or not the cap is governed by state or federal law, and whether or not the governing law treats the cap as an affirmative defense, a reenactment of sovereign immunity or a limit of liability, only two outcomes are possible--WSSC's failure to raise the cap until after judgment either did or did not waive WSSC's right to an application of the cap. If the cap was waived, the district court committed no error. Yet even if the cap was not waived, no reversal is due here if the application of the cap would not have led to a different result.
 
 
 105
 Reviewing the record, it is clear that the same damages would have been awarded whether or not the statutory cap had been applied. The LGTCA liability cap applies only to " 'actions arising from events occurring on or after' [the LGTCA's] effective date, [July of 1987]." Surratt, 578 A.2d at 751 n. 5. All of the evidence presented to the jury indicates that the relevant events in this case--the leaking of PCE and WSSC's negligence--occurred both before and after July of 1987. Maryland courts have held that environmental property damage occurs not at the time of discovery of the property damage, but at the time "the discharge of contaminants into the soil and underlying groundwater is of sufficient gravity to [produce] detectable [damage]." Harford County v. Harford Mut. Ins. Co., 327 Md. 418, 610 A.2d 286, 295 (1992). The only evidence presented to the jury on the common law damages issue was that Westfarm's property was diminished in value by the very presence of PCE; as soon as potential buyers learned of the presence of PCE, the buyers would not purchase the property. Because the evidence was undisputed that PCE leaked into the Westfarm property prior to 1987 and that the damages suffered were created by the presence of PCE, the jury's verdict as to the amount of damages would not have changed if the statutory cap on post-1987 damages were to have been applied. Therefore we conclude that the district court's denial of WSSC's motion to amend the judgment is not reversible error.
 
 III. CONCLUSION
 
 106
 For the foregoing reasons, we affirm in all respects. We emphasize that we express no opinion as to the wisdom of imposing CERCLA liability on POTWs or of waiving WSSC's immunity from common law tort claims. These questions are for the Congress and the Maryland state legislature, respectively, to decide.
 
 
 107
 AFFIRMED.
 
 
 
 [1]
 Subsequent testing revealed the presence of PCE on two other, adjoining Westfarm properties
 
 
 [2]
 By way of comparison, the maximum contaminant level for PCE in drinking water, as established by the Environmental Protection Agency, is 5 ppb. 42 U.S.C. Sec. 300g-1; 40 C.F.R. Sec. 141.61. The PCE concentration in the groundwater beneath IFI's and Westfarm's properties ranged from several hundred ppb to approximately 7000 ppb
 
 
 [3]
 The Tech Road Sewer is above the water table
 
 
 [4]
 We note that WSSC's regulations directly limit the concentration of TTOs discharged, not the quantity of TTOs discharged. The quantity of TTOs which may be discharged is therefore only limited by the total discharges of a sewer user
 WSSC regulations prohibit disposal into the sewer of "any noxious or malodorous gas or substance, which either singly or in interaction with other wastes, is capable of creating a public nuisance or hazard to life or preventing entry into sewers for their maintenance and repair." However, in light of the fact that concurrent regulations discussed supra permitted the discharge of PCE and other TTOs, PCE is apparently not within the definition of a noxious or malodorous substance.
 
 
 [5]
 A sewer system is a publicly owned treatment works
 
 
 [6]
 RCRA excludes household wastes from stringent regulation, see 42 U.S.C. Sec. 6903(27), yet a garbage dump can still be liable under CERCLA for cleanup costs for damages caused by hazardous substances released from household wastes. See Goodrich, 958 F.2d at 1201-03
 
 
 [7]
 At trial, Dr. Ram expounded on his testimony, and indicated that in his expert opinion, the PCE on Westfarm's land had travelled there from a dumpster on IFI property into which IFI had placed PCE-contaminated trash, rather than from WSSC's sewer. However, apparently the jury did not believe his testimony, as the jury held WSSC liable in negligence for the PCE contamination. Moreover, his testimony was not before the district court on Westfarm's motion for summary judgment, and it cannot be used now to manufacture a genuine issue of material fact as to whether WSSC had disproved causation
 
 
 [8]
 WSSC attempts to distinguish Artesian Water by claiming that the expert in that case was testifying about contamination of "sites" beyond the defendant's land, not about the plaintiff's land. However, the plaintiff's land was one of the "sites" beyond the defendant's land, and thus was included in the expert's opinion. Artesian Water, 659 F.Supp. at 1281. The expert was simply stating the no longer remarkable proposition that tracing pollution from one site to its source is technologically infeasible. See, e.g., Monsanto, 858 F.2d at 170. The district court in Artesian Water properly found that such expert opinion did not create a genuine issue of material fact as to whether the defendant could disprove that it was the source of contamination at plaintiff's site
 
 
 [9]
 We therefore do not need to reach the question of whether the other two elements were shown
 
 
 [10]
 Westfarm did allude to an improper, "public duty" theory in closing argument. However, "juries are presumed to follow their instructions." Richardson v. Marsh, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). An isolated allusion in closing argument, followed by the proper instructions given by the district court, could not have prejudiced WSSC, and therefore cannot form the basis for reversal here. Fed.R.Civ.P. 61
 
 
 [11]
 WSSC's brief criticizes the district court for refusing to instruct the jury specifically on the public duty doctrine. However, the district court did not abuse its discretion in determining that such an instruction was unnecessary, particularly in light of the voluminous instructions already given in the case, and the potential for a public duty doctrine instruction to mislead the jury into believing that the public duty doctrine would apply to any actions taken by WSSC to address a harm which could have been addressed by enacting or enforcing regulations instead. See Hardin v. Ski Venture, 50 F.3d 1291, 1293-94 (4th Cir.1995) ("District courts are necessarily vested with a great deal of discretion in constructing the specific form and content of jury instructions.... So long as the charge is accurate on the law and does not confuse or mislead the jury, it is not erroneous." (citations omitted))
 
 
 [12]
 Although WSSC might have been entitled, upon a request pursuant to Federal Rule of Evidence 105, to a jury instruction that the evidence was to be used to determine foreseeability but not public duty, the failure to give such a limiting instruction does not constitute reversible error where, as here, one was never requested. See United States v. Mark, 943 F.2d 444, 449 (4th Cir.1991)
 
 
 [13]
 WSSC also asserts that, as a matter of law, insufficient evidence was introduced to show negligence, because no expert testified to the scope of WSSC's duties, and because a sewer operator's duties are the type of specialized duties which are beyond the ken of a layperson. We need not decide whether the scope of a sewer operator's duties is beyond the ken of a juror, however, because a review of the record reveals that Westfarm did present expert testimony from a witness, George Frigon, on the issue. Frigon testified as to the proper construction of a sewer manhole, the proper position of an "O-ring" in a maintained sewer, and other sewer construction and maintenance practices which retard leaking